[No. B088741. Second Dist., Div. Three. July 27, 1995.]

CONTINENTAL INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DEE BANGERTER et al., Real Parties in Interest.

72

## COUNSEL

Long & Levit, Don A. Lesser, Laura P. Nash and Jeanette Traverso for Petitioner.

No appearance for Respondent.

Shernoff, Bidart & Darras, Sharon J. Arkin, Greene, Broillet, Taylor & Wheeler and John C. Taylor for Real Parties in Interest.

## OPINION

**CROSKEY, Acting P. J.**—An insurer which had issued a directors and officers (D & O) liability policy sought a summary judgment in a bad faith action brought by three director insureds who alleged that the insurer had unreasonably failed to defend or indemnify them in a timely manner thus causing them economic loss and emotional distress. The trial court denied the summary judgment and the insurer seeks writ relief.

Continental Insurance Company (Continental)[1] seeks a writ of mandate to compel the trial court to vacate its denial of Continental's motion for summary judgment in the action filed by the real parties in interest, Dee Bangerter, Lee Bangerter and Ted Nelson (collectively, the plaintiffs) and to issue a new and different order granting said motion. Because we conclude that an issue of material fact does exist as to whether the plaintiffs in fact suffered any economic loss by virtue of Continental's actions under the policy, we deny the requested writ relief.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

The plaintiffs are the former directors of a corporation known as Winn Enterprises and a subsidiary corporation, KF Dairies, Inc. During the period October 25, 1983 through October 25, 1987, they were insured for liability for "wrongful acts" committed in their capacity as directors under Continental's "claims made" Directors' and Officers' Liability and Company Reimbursement Policy (Policy No. HI177466; hereinafter the policy). The policy provided coverage (1) to Winn Enterprises (and any subsidiaries) under section A, the Company Reimbursement for Directors and Officers Liability and (2) to the directors and officers of Winn Enterprises (and any subsidiaries) under section B of the policy. It is this latter section of the policy which is the subject of these proceedings.

---

[1]Continental is the successor in interest to Harbor Insurance Company, the actual issuer of the D & O policy involved in this matter. However, for sake of simplicity and clarity, and because such succession is not significant to the issues raised in the pending writ, we treat Continental as the insurer throughout this opinion.

[2]Our discussion of the relevant facts is based upon the disputed and undisputed material facts reflected in the record which we have been provided.

Before reviewing the factual context in which this case arises, it would be useful to set forth, at least in summary fashion, the relevant provisions of the policy.

By endorsements, the policy has a $5 million limit of Continental's total liability; it also provides for an insured retention of $250,000.[3] The insuring agreement provided, "This policy shall, subject to its terms, conditions and limitations as hereinafter provided, pay *on behalf of* each and every person who was or now is . . . a director or officer of the corporation . . . *loss* (as hereinafter defined) arising from any claim or claims made against the insureds . . . during the policy period by reason of any *wrongful act* (as hereinafter defined) in their respective capacities as directors or officers. . . ."

The terms "loss" and "wrongful act" were defined in clause 2, subparagraphs (C) and (D) of the policy as follows: "(C) The term 'loss' shall mean any amount an insured is obligated to pay in respect of his legal liability whether actual or asserted, for a wrongful act (as defined in (D) of this clause), and subject to the applicable limits and conditions of this policy, shall include damages, judgments, settlements and *costs, charges and expenses incurred in the defense of actions*, suits or proceedings and appeals therefrom . . . . [¶] (D) The term 'wrongful act' shall mean any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted by the insureds or any of the foregoing so alleged by any claimant or any matter claimed against them solely by reason of their being such directors or officers of the corporation." (Italics added.)

Finally, the policy spelled out the manner in which actual and potential claims would be reported to Continental:

"7. *Loss Provisions*

"(A) The time when a loss shall be incurred within the meaning of this policy shall be the date on which the insured shall give written notice to the company as hereinafter provided.

"(B) If during the policy period or during the discovery period, if any, claim is made against the directors or officers, the insured shall as a

---

[3]Specifically, endorsement 8 to the policy provides: "In consideration of the premium charged, it is understood and agreed that any claims or suits arising from any tender offer or other proposal to acquire another company, including any arising from the acquisition or merger of another company, shall be subject to a $250,000 retention." The underlying action for which the plaintiffs sought a defense and indemnity did indeed arise from the acquisition by Winn Enterprises of another company.

condition precedent to its rights under this policy give to the company notice as soon as practicable in writing of any such claim.

"C) If during the policy period or during the discovery period if the right is exercised by the insured in accordance with clause 8(A)[4]

"(i) The insured shall receive written or oral notice from any party that it is the intention of such party to hold the directors or officers responsible for the results of any specified wrongful act by the directors or officers while acting in the capacities aforementioned; or

"(ii) The insured shall become aware of any occurrence which may subsequently give rise to a claim being made against the directors or officers in respect of any such wrongful act;

"And shall in either case during such period give written notice to the company of the receipt of such written or oral notice under (i) above or of such occurrence under (ii) above, then any claim which may subsequently be made against the directors or officers arising out of such wrongful act shall for the purpose of this policy be treated as a claim made within the period of this policy. . . ."

In June of 1983, Winn Enterprises acquired all of the common stock of KF Foods, Inc., in a leveraged buyout. KF Foods was the parent company of KF Dairies, Inc. (KFD). The plaintiffs also became directors of KFD. In June of 1985, KFD acquired Foremost Dairies, Inc. (Foremost), in another leveraged buyout. It is this transaction which led to this litigation. Prior to KFD's acquisition of Foremost, Foremost itself had been the subject of still another leveraged buyout transaction. As a result, both KFD and Foremost were heavily burdened with debt even before KFD's leveraged acquisition of Foremost. These circumstances ultimately led to the bankruptcy and liquidation of both KFD and Foremost in 1986.

On October 21, 1986, the unsecured creditors committees of these two bankrupt corporations gave written notice of their claims based upon the directors' "breaches of duty and mismanagement which has resulted [in] damage to [the] creditors" and that such "claims may be asserted against [the directors." On October 23, 1987, just two days prior to the expiration of the

---

[4]Continental's three-year policy was due to expire on October 25, 1986, and Continental had given notice that it would not be renewed. As authorized by clause 8(A), Winn Enterprises therefore purchased, for an additional premium, a "discovery period" extension "of the coverage granted by [the] policy in respect of any claim or claims made against the directors or officers during the period of 12 months after . . . the date on which the policy ends but only in respect of any wrongful act committed before such date. . . ."

extended "discovery period," the several directors, including plaintiffs, gave written notice to Continental, through Winn Enterprises' risk management consultant, in which there were identified a number of events and circumstances which had occurred during the policy period and which, according to the notice, constituted "potential claims" within the meaning of the "Loss Provisions" clause of the policy (clause 7(C)).

This notice was extensive and detailed.[5] It listed, for example, the creation of various compensation arrangements with current or former managing officers, employment and severance contracts, incentive plans, stock option agreements and pension benefit agreements, all or any of which might be attacked by corporate creditors, shareholders or bondholders as wrongful self-dealing or mismanagement. More to the point of the issue raised in this case, the notice specifically called attention to the potentiality of the very claim which was later asserted against Winn Enterprises and for which coverage was sought. Paragraph 14 of the October 23, 1987, notice stated, in pertinent part, "During the policy period, Winn acquired certain entities. Without limiting the generality of the foregoing, in particular, during the policy period, Knudsen acquired Foremost and Winn Enterprises purchased MountainWest Savings and Loan Association. In addition, Knudsen acquired Meyer Dairy, Inc., in a transaction guaranteed by Winn Enterprises. Foremost and Knudsen have since been sold, and the operations of Meyer Diary have ceased. *Claims in the future may be asserted challenging the wisdom of these acquisitions or the management of these businesses after they were acquired, or the distribution of the assets of these companies upon their sale, liquidation, ceasing to do business or other disposition. . . .*" (Italics added.)

On June 30, 1988, eight months after the expiration of the policy's extended coverage period, the underlying action was filed against the plaintiffs and other defendants (KF Dairies, Inc. v. Citicorp North America, Inc.

[5]The written notice sent on October 23, 1987, by Winn Enterprises stated, in its opening paragraphs: "In accordance with the terms and conditions of Harbor Insurance Company's Policy No. HI177466, we are giving written notice of facts, circumstances or situations which may subsequently give rise to a claim being made against us for a specific act, error, omission or bodily injury. These matters are being reported to you at this time pursuant to the notice provisions of your policy. [¶] Groups of disclosures are for convenience only and should not be construed to limit the nature or extent of the disclosure in any way. For purposes of this letter, 'Winn' means Winn Enterprises and/or any or all of its subsidiaries; 'Winn Enterprises' means Winn Enterprises; 'Foremost' means Foremost Dairies, Inc.; and 'Knudsen' means Knudsen Corporation and/or Knudsen Foods, Inc. [¶] The management of Winn is not able to predict whether any claims will be asserted based upon the occurrences described below, nor the amount of any such claims, if asserted. Given the broadest definition, each of the following may be deemed to be 'an occurrence which may subsequently give rise to a claim being made against the directors or officers' of Winn as those terms are used in the Directors and Officers Liability and Corporation Reimbursement policy issued to Winn by Harbor Insurance Company."

(Super. Ct. L.A. County, 1988, No. C690962).) It was alleged that the plaintiffs (and other directors) had breached their fiduciary duties as directors of KFD by approving the leveraged acquisition of Foremost in 1985 which, the complaint alleged, was not in the best interest of KFD and ultimately caused its demise.

In the fall of 1988, the plaintiffs notified Continental of this action and requested coverage and a defense under the policy.[6] Continental promptly denied coverage on the principal ground that the claim set out in the underlying action had not been made during the policy period. Continental asserted that the potential claim notice of October 23, 1987, was inadequate notice to satisfy the requirements of clause 7(C). Finally, Continental rejected plaintiff's request for a defense of the underlying action on the ground that the policy did not promise a defense and Continental therefore had no obligation to provide one.

In spite of this denial, however, Continental ultimately did participate in settlement discussions with respect to the underlying action. The plaintiffs in the underlying action were demanding over $170 million. On August 22, 1992, Continental agreed to settle all of the claims against the plaintiffs by paying the policy limits of $5 million. This sum was actually paid on October 28, 1992. None of the plaintiffs was required to pay anything toward that settlement.

On June 8, 1992, a little over four months before the underlying action was finally settled and resolved as to the plaintiffs, this action for insurance bad faith was filed by the plaintiffs Dee Bangerter and Lee Bangerter.[7] In their complaint, plaintiffs allege that Continental "unreasonably and in bad faith" denied coverage of the claims asserted in the underlying action and refused to pay the costs of defense. Plaintiffs claim to have suffered economic loss as a result of Continental's actions in the form of attorney fees

---

[6]Actually, the only plaintiff directors named as defendants in the underlying action were Lee Bangerter and Ted Nelson. Plaintiff Dee Bangerter had filed personal bankruptcy, several months before the underlying action was filed and the plaintiffs in the underlying action were ordered to proceed against him only to the extent of his insurance coverage. As a result, he apparently incurred no defense costs as his attorneys have dropped their fee claims against him due to the bankruptcy. Dee Bangerter conceded in his deposition that while he had other financial problems, the factor that pushed him into bankruptcy was the claims being asserted by the KF Dairies and Foremost creditor committees and the likelihood that the D & O insurance would not be renewed and that he would have no insurance coverage for those claims.

[7]On September 1, 1993, plaintiff Ted Nelson filed a substantially similar complaint (although he added a cause of action for breach of contract). These two actions were later consolidated prior to the summary judgment motion which is the subject of these writ proceedings.

incurred by them in a *total* sum of approximately $56,000. In addition, they also claim to have suffered worry, anxiety and emotional distress for which they seek compensation; and finally, they allege that Continental was guilty of malice and oppression justifying an award of punitive damages. After a period of reasonable discovery was concluded, Continental moved for summary judgment or, in the alternative, for the summary adjudication of plaintiffs' claims.

Continental argued in support of its motion that the undisputed evidence demonstrated that (1) there was no coverage under the policy since (a) the claim in the underlying action had not been made during the policy period or during the extended discovery period, (b) the underlying action had not been filed until June 30, 1988, over eight months after the expiration of the discovery period and (c) the potential claims notice of October 23, 1987, was legally inadequate; (2) plaintiffs had suffered no economic loss since Continental had accepted and paid a policy limits offer ($5 million) to settle the case at no expense to plaintiffs and their claimed defense costs were well within the $250,000 retention which the plaintiffs were required to absorb in any event; (3) Continental's total obligation under the policy for the costs of *both* indemnification and defense could not exceed the $5 million which they had in fact paid; and finally, (4) if plaintiffs could show no economic loss, then no cause of action for bad faith could be prosecuted.

The trial court denied the motion, asserting that disputed issues of fact remained for trial as to whether the $250,000 had actually been exhausted by defense costs incurred or paid by directors *other* than plaintiffs and whether the $250,000 retention required insureds to put up the first dollar or was it simply to be deducted from payments otherwise due under the policy. The court also found unresolved issues of fact relative to whether the "potential claim" notice of October 23, 1987, was sufficient to satisfy the requirements of the policy.

Continental sought writ relief in this court. On February 7, 1995, we issued an alternative writ of mandate and set the matter for hearing.

## CONTENTIONS

Continental contends, as it did in the trial court, that no material issues of disputed fact remain to be resolved. Plaintiffs have suffered no economic loss in excess of the agreed self-retention and thus, as a matter of law, can prosecute no bad faith claim against Continental. Secondly, the notice of

claim was inadequate under the terms of the policy and therefore there was no coverage in any event.

## DISCUSSION

### 1. *Standard of Review*

"Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. [Citation.] We review the trial judge's decision not to grant the summary judgment de novo. [Citations.]" (*Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) A moving party demonstrates a right to entry of summary judgment by producing evidence which establishes that there is no issue of fact to be tried. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Johnson* v. *Berkofsky-Barret Productions, Inc.* (1989) 211 Cal.App.3d 1067, 1071 [260 Cal.Rptr. 67].) The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. (*Taylor* v. *Fields* (1986) 178 Cal.App.3d 653, 659 [224 Cal.Rptr. 186].)

Appellate review of summary judgment is limited to the facts contained in the documents presented to the trial court. This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties' papers. (*Twain Harte Associates, Ltd.* v. *County of Tuolumne* (1990) 217 Cal.App.3d 71, 80 [265 Cal.Rptr. 737]; *Taylor* v. *Fields, supra,* 178 Cal.App.3d at p. 660.) In so doing, we apply the same three-step analysis required of the trial court: We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. (*Zuckerman* v. *Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1400-1401 [232 Cal.Rptr. 458].)

### 2. *The Notice of Potential Claim Was Legally Adequate*

In the trial court, Continental argued, as it does here, that the notice of potential claims submitted by Winn Enterprises on October 23, 1987, failed to satisfy the plain requirements spelled out in the policy. Under clause 7(C), a potential claim notice had to provide to Continental notice that

(1) the insureds had received written or oral notice that a third party intended to hold them responsible for the results of *any specified wrongful act* committed by the insureds or (2) the insureds had become aware of an occurrence which *might subsequently* give rise to a claim against the insureds "in respect of *any such wrongful act.*"

Continental asserts that the October 23 letter is simply a "laundry list" which does nothing more than *speculate* about claims which might be made. Continental complains that "[T]he letter did not notify Continental that any specified wrongful acts were being alleged at the time notice was given." Given that plaintiffs are relying upon the provisions of clause 7(C)(ii) which permits notices of "occurrences" which may lead to a future claim, we have some trouble with Continental's argument. As the trial court pointed out, plaintiffs had provided all of the information they had; that is, they provided the best notice they could. The notice clearly spelled out imprudence, negligence and mismanagement as possible allegations which were likely, if not anticipated, in connection with the acquisition by Winn Enterprises of certain corporate subsidiaries.

The several cases cited by the parties do not provide much help with this issue. None, it appears, involved a specific notice as we have here; but rather the arguments raised in these cases sought to characterize as adequate information received by the insurer from a variety of other sources. While it is true that a nonspecific communication which merely discloses that certain events have occurred will not constitute a notice of a potential claim (see *F.D.I.C.* v. *Mijalis* (5th Cir. 1994) 15 F.3d 1314, 1335-1336, and cases reviewed therein), we have much more here. Indeed, it is our view that the detailed potential claim notice delivered in this matter clearly satisfies the requirement spelled out in *Mijalis* that the insured *objectively* comply with the potential claim notice requirements specified in Continental's policy. (*Id.*, at p. 1335.)

The notice provided in this case was far more specific than the oral threat made to the director insureds in *Winkler* v. *National Union Fire Ins. Co.* (9th Cir. 1991) 930 F.2d 1364. In *Winkler*, the court had before it the same policy language as is presented here. An oral threat "to take whatever legal action necessary to recoup losses" allegedly suffered by a third party (resulting from a corporate overdraft of $3.2 million) was made to the director insureds. However, the directors failed to give notice of such threatened action prior to expiration of the policy period and the *Winkler* court held that there was no coverage under the D & O policy for the legal action filed after the policy expired. The court held that the oral threat was not an actual claim, but only a *potential claim* for which notice was required.

As the court put it, the "[Directors] had a clear right under the policy to seek coverage for these inchoate claims. Having failed to do so, they should not now be allowed to recharacterize them as actual claims made while the policy was in effect. We therefore hold that *the [oral] threats were potential claims*, coverage for which was properly denied as untimely . . . ." (*Winkler v. National Union Fire Ins. Co., supra*, 930 F.2 at p. 1367, italics added.)

We use the same reasoning here, except that we reach a different result because the plaintiffs *did* give Continental timely notice of the claims which they believed might be asserted against them. This is both the purpose and function of clause 7(C). Continental cannot avoid coverage by claiming that plaintiffs' description of possible future events was not more specific. Plaintiffs provided all of the information they had as well as all they were likely to have until a specific complaint was actually filed by the complaining third parties. The policy could not reasonably require more.

### 3. *An Issue of Material Fact Exists as to Whether Plaintiffs Sustained Any Recoverable Damages*

■ Continental argues that summary judgment should have been granted because the uncontroverted facts demonstrated that plaintiffs sustained no economic loss and therefore could assert no bad faith claim. In other words, Continental did what was required of it under the terms of the policy; and whatever expenses may have been incurred by plaintiffs to defend the underlying action are expenses which, under the terms of the policy, they were required to bear. As the following discussion demonstrates, the record simply does not support Continental's contention.

### a. *Principles of Policy Construction*

In considering the impact of the policy provisions on plaintiffs' claim we are guided by certain fundamental principles applicable to the construction of insurance policies.

■ The overriding goal of policy interpretation is to give effect to the parties' mutual intentions as of the time of contracting. (Civ. Code, § 1636.) Where policy language is clear and explicit and does not lead to an absurd result, we ascertain this intent from the written provisions and go no further. (Civ. Code, §§ 1638, 1639; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The words of an insurance policy generally are to be understood in their ordinary and popular sense

unless the parties use them in a technical sense or "a special meaning is given to them by usage. . . ." (Civ. Code, § 1644.)

However, if the terms of a contractual promise are ambiguous or uncertain, we must interpret the promise "in the sense in which the promisor [i.e., the insurer] believed, at the time of making it, that the promisee [i.e., the insured] understood it." (Civ. Code, § 1649.) "This rule, as applied to a promise of coverage in an insurance policy, protects . . . 'the objectively reasonable expectations of the insured.' " (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) If use of this rule does not eliminate the uncertainty, then we construe the applicable language against the insurer, the drafter who created the uncertain language in the first place. (*Ibid.*; Civ. Code, § 1654.)

A policy provision is ambiguous if it is capable of more than one reasonable construction. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) However, we will not strain the policy language to create an ambiguity. (*Ibid.*) Moreover, we will not label a provision ambiguous simply upon isolating phrases and considering them in the abstract. Rather, we must construe the provision in relation to the whole of the instrument, with each clause giving meaning to the other. (*Id.*, at pp. 916-917 and fn. 7; Civ. Code, § 1641.)

b. *The Defense Obligation Under a D & O Policy*

 Plaintiffs' arguments seem to assume that Continental had an obligation under the policy to provide them with a defense of the underlying action when it was tendered in 1988. If we were dealing with a comprehensive general liability policy that would most certainly be the case. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) However, such a burden is not imposed by the typical D & O policy such as the one we have in this case. D & O policies generally do not obligate the insurer to provide the insured with a defense. What they do require is that the insurer reimburse the insured for defense costs as a part of the "loss," a term defined under the policy, or pay such costs as they are incurred by the insured. Thus, it is the insured who selects defense counsel and controls the defense of the underlying case. (*Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295].)

 Our examination of the plain language of the Continental policy, read in context of the whole policy, leads us to two important conclusions.

First, there is a total liability limit of $5 million *and this includes defense costs*; thus, this is a self-consuming policy. Second, a single retention of $250,000 per claim is imposed and Continental is only liable for "loss" in excess of that amount, up to the maximum liability of $5 million. The plaintiffs urged the proposition that only one retention per claim was required, while Continental contends that each insured had to bear that burden. We believe that the plaintiffs are correct in their construction of the policy terms. Endorsement No. 8 provides for "*a* $250,000 retention" to apply to any claims arising from "*any tender offer* or other proposal to acquire another company." This language could not reasonably be read to require that more than one retention be applied to litigation arising from a single corporate acquisition.

The policy contains no promise to provide a defense. Under clause 2(C), the term "Loss" is defined to *include* not only damages, judgments and settlements, but also the costs, charges and expenses incurred in the defense of the underlying action which the insured is "obligated to pay." Under clause 6, the plaintiff could not incur defense costs or expenses without the consent of Continental (which consent could not be unreasonably withheld); the plaintiffs were not required under the policy to contest the underlying action (clause 6(B)), unless mutually selected counsel so advised, but in the event of such advice or the consent of Continental to defense expenditures, Continental agreed to 100 percent of all such costs and expenses. However, as already noted, endorsement No. 8 provides that a claim, such as the one asserted in the underlying action, is subject to a $250,000 retention.[8]

These provisions, read together, mean that Continental had no obligation to provide a defense, but only to pay defense costs incurred with Continental's consent or upon the advice of mutually agreed counsel.[9] In addition, the plaintiffs were self-insured for the first $250,000; until that amount had been paid, Continental had no obligation to make any payment towards the defense of the underlying action. (*Nabisco Inc.* v. *Transport Indemnity Co.*, *supra*, 143 Cal.App.3d at p. 836.) Finally, in no event would Continental have any obligation to pay any amount, including sums for defense costs, beyond the $5 million liability limit spelled out in endorsement No. 13.

---

[8]A retention such as that provided for in the policy amounts to "self-insurance" up to the amount of the retention. The consequence of such a provision is that Continental's coverage is "excess" to the amount of the retention. (*Nabisco, Inc.* v. *Transport Indemnity Co.* (143 Cal.App.3d 831, 836 [192 Cal.Rptr. 207].)

[9]Although the record is not clear on the point, there appears to be no dispute that one of these alternative conditions was in fact met.

c. *Application to the Facts Here*

In support of its motion for summary judgment Continental presented evidence that on October 28, 1992, it paid the sum of $5 million in full settlement of all claims asserted against the plaintiffs by the underlying action. None of the plaintiffs was required to contribute to this settlement and they were dismissed from the case. These facts are not disputed.

Continental also offered the deposition testimony of the plaintiffs themselves which established that the *total* amount of defense costs incurred or paid by them was approximately $56,000[10] well below the $250,000 retention required under the policy. Because of the settlement of the underlying action in 1992, the total economic loss which plaintiffs could claim is the sum of $56,000 paid or incurred for such legal fees.

The record, however, also reflects a dispute as to whether the self-insured retention had in fact been paid or incurred by one or more of the insureds. David Greenawalt, another insured, but not a party hereto, also was covered under the policy. In opposition to Continental's motion, plaintiffs offered the declaration of Richard Posell, Greenawalt's attorney. Mr. Posell stated that Greenawalt had "incurred $220,075.05 in attorney's fees and $30,800.53 in costs in defending himself in the underlying action." If true, such payment would have satisfied the self-insured retention imposed by the policy and would have entitled plaintiffs to at least a pro rata reimbursement of their defense costs paid or incurred by them which contributed to a total defense expense in excess of the $250,000 retention. Continental did not dispute that Greenawalt had *incurred* such sum, but rather contended that it was Continental, not Greenawalt, that had *paid* such fees and costs. In a responsive declaration, Continental countered the Posell testimony with the declaration of its claims counsel, Anita Dispensa. She stated, "Continental made several payments of the fees and costs billed to Mr. Greenawalt by Mr. Posell's firm, Shapiro, Posell and Close, for the defense of the *KP Dairies* case, including three totaling $71,145.89. Continental made an additional payment jointly to Mr. Greenawalt and the Shapiro, Posell firm of $189,195.19, of which I understand $101,442.96 was to pay the fees of the Shapiro firm."

However, what these competing declarations do not tell us is when and in what increments and sequence these payments were made. As we read the

---

[10]Bangerter testified that he actually paid no more than $5,000 in legal fees to defend the underlying action; in addition he has been billed (and sued) for an additional $34,389.52. Dee Bangerter was originally a co-obligor on the same fees as those billed to Lee; however, their common attorneys have dropped their claims against him, apparently due to his bankruptcy. Plaintiff Ted Nelson paid approximately $16,643.13 in legal fees to his attorney.

policy, only a single $250,000 retention is required for any particular claim no matter how many insureds are involved. *When that retention is satisfied, then Continental's obligation to fund an insured's loss arises.* Since the term "loss" includes the cost of defense, the insureds could then justifiably call upon Continental to bear that excess burden. What we cannot determine from this record is just how, if at all, the self-insured retention was satisfied; nor can we determine when, or if, there was a refusal to pay a reimbursement demand after the retention was actually satisfied (assuming it was). If the retention was satisfied then it must be determined when that occurred and which insureds contributed thereto. If more than one insured contributed to the satisfaction of the retention, then each should be entitled to claim a pro rata share in any reimbursement of defense costs which are in excess of the retention amount. These are factual issues which have to be sorted out by the trial court and, on this record, preclude a summary judgment in Continental's favor. This issue is critical to plaintiffs' case, since the only economic loss claimed is the $56,000 in unpaid legal bills which they incurred.[11]

As it is possible that on remand it may be determined that plaintiffs did indeed suffer no economic loss, we discuss, for the assistance of the trial court, the legal consequences which would then flow.

### 4. *Absent Economic Loss, Plaintiffs Would Have No Cause of Action for Bad Faith*

 Plaintiffs argue that Continental's unreasonable refusal to pay defense costs and the delay in effecting a settlement of the underlying action caused the severe emotional distress and that they are entitled to pursue their bad faith action irrespective of their lack of economic loss. This contention ignores the fact that a claim for emotional distress in a bad faith action cannot stand alone, but must be accompanied by some showing of economic loss.

As the Supreme Court recently stated, in an explanation of the nature of an action for bad faith, "[I]n *Gruenberg* [v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 (108 Cal.Rptr. 480, 510 P.2d 1032)], we . . . explained . . . [that an action for bad faith] is an action for the interference with property rights, not

---

[11]Plaintiffs also argue that Continental's failure to settle earlier caused them damage. However, it is well established that an insured is not damaged by the insurer's "wrongful" failure to settle a claim unless the insured suffers a judgment in excess of policy limits. (*Finkelstein* v. *20th Century Ins. Co.* (1992) 11 Cal.App.4th 926, 929-930 [14 Cal.Rptr.2d 305].) Thus, even if we assume that Continental delayed unreasonably in waiting four years to settle the underlying action, such delay caused no economic loss to the plaintiffs.

personal injury. (9 Cal.3d at p. 580.) We observed that damages for emotional distress are compensable as *incidental damages* flowing from the initial breach, not as a separate cause of action: '[Because] we are concerned with mental distress resulting from a substantial invasion of property interests of the insured and not with the independent tort of intentional infliction of emotional distress, we deem [the requirements of outrageous conduct and severe emotional distress] to be inapplicable.' (*Ibid.*) Thus, *once the threshold requirement of economic loss is met,* the insured need not show additional loss or injury to recover damages for his mental distress as long as such damages were proximately caused by his insurer's breach of the implied covenant. [Citation.]" (*Gourley* v. *State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 128 [3 Cal.Rptr.2d 666, 822 P.2d 374], italics in original and italics added.)[12]

The *Gourley* court, in rejecting the proposition that Civil Code section 3291 (which allows prejudgment interest in certain personal injury actions) applied to insurance bad faith claims, emphasized that a breach of the implied covenant of good faith was actionable *because* such conduct caused financial loss to the insured; it was the financial loss or risk of financial loss which defined the cause of action. "Mental distress is compensable as an aggravation of the financial damages, not as a separate cause of action. [Citation.]" (*Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 129.) Since emotional distress is merely incidental to the property right invasion represented by a bad faith claim, it was inappropriate to apply a statutory remedy (prejudgment interest), intended for personal injury actions, to such a cause of action. ▮ We hold that this reasoning applies here. In the absence of any economic loss there is no invasion of plaintiffs' *property rights* to which their alleged emotional distress over Continental's denial and delay could be incidentally attached. In short, there would be no legal basis for an action for bad faith.

This conclusion would also necessarily dispose of plaintiffs' claim for punitive damages. If an essential element of plaintiffs' bad faith claim (i.e., economic loss) cannot be shown, then there would be no viable tort action and thus no basis for an award of punitive damages. (*Carr* v. *Progressive Casualty Ins. Co.* (1984) 152 Cal.App.3d 881, 892 [199 Cal.Rptr. 835]; *Werschkull* v. *United California Bank* (1978) 85 Cal.App.3d 981, 1002-1004

---

[12]Even then, as one case has recently stated in describing the proof burdens of an emotional distress claim in those cases involving only a financial injury, ". . . before recovery for emotional distress may be allowed in a case in which the only other damage is financial, there must be a showing of 'substantial' injury other than the emotional distress, or the emotional distress damage itself must be 'severe, substantial or enduring.' " (*Torres* v. *Automobile Club of So. California* (1995) 41 Cal.App.4th 468, 480-481 [43 Cal.Rptr.2d 147] review granted on specified issues Sept. 28, 1995 (S048329).)

[149 Cal.Rptr. 829]; see also *Tan Jay Internat., Ltd.* v. *Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 709 [243 Cal.Rptr. 907].)

## DISPOSITION

The alternative writ is discharged. The petition for a peremptory writ of mandate is denied. The matter is remanded for further proceedings not inconsistent with the views expressed herein.

Kitching, J., and Aldrich, J., concurred.