**MARYLAND CASUALTY COMPANY, a Maryland Corporation, Plaintiff-counter-defendant-Appellee,**

v.

**Jenner KNIGHT, an individual, Defendant-counter-claimant-Appellant.**

**No. 95–55300.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1996.

Decided Sept. 26, 1996.

Steven A. McKinley, San Diego, CA, for defendant-appellant.

John E. Feeley, A. Brooks Gresham, Sedgwick, Detert, Moran & Arnold, Irvine, CA, John P. McCormick, McCormick & Mitchell, San Diego, CA, for plaintiff-appellee.

Before: WIGGINS and TROTT, Circuit Judges, BREWSTER, District Judge.[1]

BREWSTER, District Judge:

## STATEMENT OF THE CASE

This is an appeal from a summary judgment on appellee's complaint for declaratory judgment, and an adverse jury verdict and judgment on appellant's counterclaim for tortious breach of contract. In addition to the issues raised on appeal, we consider whether the district court abused its discretion by exercising jurisdiction over the case.

## I

## FACTS

Appellant Jenner Knight (hereinafter Knight) obtained a policy of fire insurance from appellee Maryland Casualty Company (hereinafter Maryland) on a commercial building he owned in San Diego. It was under partial lease to San Diego Indoor Range (hereinafter SDIR). SDIR installed gun range equipment in its leasehold to operate an indoor target shooting range.

On May 1, 1991, the building was heavily damaged by fire. Thereafter, SDIR vacated its leasehold, removed the gun range equipment from the building, and made no further payments under the lease.

At the time of the fire, the only encumbrance on the building was a first deed of trust securing a refinanced $1.35 million loan by Great American Bank.[2] The Bank was

---

1. The Honorable Rudi M. Brewster, United States District Judge, Southern District of California, sitting by designation.

2. In the summer of 1991, the Resolution Trust Company (hereinafter the RTC) took control of Great American. The RTC later sold the loan together with the trust proceeds to GAP Portfolio Partners which then converted the trust funds to

included on the Maryland policy as a "loss payee."

The day after the fire, Knight notified Maryland of the fire damage to his building, and on June 19, 1991, Knight submitted a partial proof of loss requesting an immediate advance of $170,000 to enable him to clean up the site, cover costs, and make up the loss of income to date. On July 8, 1991, Maryland made a partial advance payment of $170,000 on the building loss claim. As provided by the terms of the policy, the Bank was also named on the payment draft. The Bank refused to endorse the draft to Knight, but rather deposited the funds into an escrow account. Knight was unable to access the funds to make repairs.

On November 12, 1991, Knight submitted his sworn statement of loss on the entire claim. In addition to the property fire loss claim, he submitted additional claims for vandalism to the building, a claim for SDIR's indoor gun range equipment, and a business interruption claim.

After investigation, Maryland informed Knight that it was willing to pay for a portion of his property claim (i.e., the fire loss or the cost to repair or replace the fire damage to the building if Knight rebuilt), but would deny a portion of his claim, including his claim for SDIR's gun range equipment.[3] On Nov. 21, 1991, Maryland made payment of $401,126.35, which together with the advance payment of $170,000 represented Maryland's calculation of the actual fire loss to the building minus the $500 deductible. Maryland also paid the full policy limit of $113,400 for Knight's business income loss. Maryland later recalculated. By late January, 1992, Maryland had made a total payment of $622,000 on Knight's fire loss claim, and $133,400 on his business income loss claim. Knight had not commenced any repair or replacement.

On February 3, 1992, the Bank commenced foreclosure proceedings on the property because Knight had not met his monthly payments. Knight filed for Chapter 11 bank-

ruptcy to preclude the foreclosure. Knight and the Bank then came to a settlement whereby Knight released claims to the $622,-000 fire loss payment by Maryland in exchange for forgiveness of the loan secured by the first deed of trust.

Knight then demanded an appraisal of the actual property cash value and the cost to replace his building pursuant to his policy's contractual appraisal provision. On December 23, 1992, after a six-day hearing, a three-person appraisal panel determined that the actual cash value of the building after the fire was $620,000 and the cost to replace the building would be $752,872.90.

On March 3, 1992, Maryland filed its complaint in district court against Knight for declaratory judgment to resolve all of the parties' disputes under the policy. In turn, Knight on June 26, 1992, filed a counterclaim against Maryland for tortious breach of contract and emotional distress (hereinafter the "counterclaim").

On December 4, 1992, the district court granted partial summary adjudication on Maryland's claim that SDIR's gun range was not covered under the policy. On September 16, 1993, the court granted partial summary adjudication on Maryland's claims that it had no duty to indemnify Knight for replacement cost until Knight actually repaired or replaced his building, and that Maryland's limit of liability in that event was the lesser of either the appraisal amount of $752,872.90 or the actual cost of replacement. The court entered summary judgment, since these adjudications concluded all issues in the complaint. Knight's counterclaim was preserved for trial.

After having suffered summary judgment on the complaint, and over nineteen months after the complaint was filed, Knight on October 25, 1993 filed an action in the San Diego County Superior Court, captioned *Jenner Knight v. San Diego Indoor Range, et al.,* Court No. 670089. Maryland was not a party to that action. The state court com-

its own account. When Knight eventually settled his dispute with the holder of the first deed of trust, the settlement was between Knight and GAP. To avoid confusion, the term "Bank" shall refer to the relevant financial institution.

**3.** The actual cash value of the gun range equipment was $95,000 and the replacement cost value was over $200,000.

plaint alleged SDIR breached its lease agreement by, among other things, "willfully removing without [Knight's] consent alterations made to the premises by [SDIR]" [i.e. the gun range equipment].

Thereafter, on Dec. 6, 1994, trial proceeded in the district court on Knight's counterclaim. The court denied Knight's motion *in limine* to exclude evidence of Knight's settlement with the Bank, finding the settlement relevant to Knight's emotional distress claim. The jury concluded that Maryland had acted unreasonably in handling Knight's claim, but also concluded that Maryland's negligence was not a cause of injury to Knight. No damages were awarded. The district court entered judgment for Maryland on January 11, 1995.

Knight timely filed his notice of appeal on February 2, 1996, seeking review of: (1) the district court's finding that the gun range equipment was not covered by the Maryland policy; (2) the district court's denial of Knight's motion to revise the summary judgment order; (3) the district court's conclusions that Knight was required to actually replace the building before collecting the replacement cost, and that the appraisal price was the maximum potential payment; and (4) the district court's decision at trial to admit evidence of Knight's settlement with a third party. The parties were requested also to brief the threshold issue of the district court's exercise of jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude that the district court properly exercised jurisdiction over this matter, and we affirm as to all other issues raised on the appeal.

## II

### DISCUSSION

**A. The Exercise of Jurisdiction Under the Declaratory Judgment Act**

The Declaratory Judgment Act (hereinafter the "Act") does not itself confer federal subject matter jurisdiction; rather, it vests a district court with discretion to proceed with respect to a certain type of case already "within its jurisdiction." 28 U.S.C. § 2201(a).[4] Thus, when a district court with subject matter jurisdiction chooses to hear an action brought under the Act, the issue raised is not a "jurisdictional" question, but a "legal" one: given that federal subject matter jurisdiction exists, did the district court nevertheless abuse its discretion by choosing to exercise this jurisdiction? *See, e.g., Wilton v. Seven Falls Co.*, —— U.S. ——, ——, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.").

The primary instance in which a district court should exercise its discretion to dismiss a case is presented when there exists a parallel proceeding in state court. The decision not to exercise jurisdiction is appropriate under such circumstances, because "[o]rdinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175–76, 86 L.Ed. 1620 (1942). In this circuit we have held that federal courts should:

> decline to assert jurisdiction in insurance coverage and other declaratory relief actions presenting only issues of state law during the pendency of parallel proceedings in state court unless there are circumstances present to warrant an exception to that rule.

*Employers Reinsurance Corp. v. Karussos*, 65 F.3d 796, 798 (9th Cir.1995) (internal quotations omitted); *American National Fire*

---

4. Section 2201(a) provides, in pertinent part, that in cases "within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration...." Actions brought under the Act must be founded on an independent basis for subject matter jurisdiction. *Staacke v. United States Secretary of Labor*, 841 F.2d 278, 280 (9th Cir.1988). Here, the parties satisfied the requirements for jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.

*Insurance Company v. Hungerford,* 53 F.3d 1012, 1019 (9th Cir.1995). This rule is intended to serve several purposes, including: "the conservation of judicial resources, the avoidance of duplicative litigation, [and] the avoidance of the needless resolution of state law questions in federal court...." *Karussos,* 65 F.3d at 800.

We have similarly indicated that a district court should exercise its discretion to decline jurisdiction when the federal action has simply been filed in anticipation of an impending state court suit; for example, when an insurer anticipates that its insured intends to file a non-removable state court action, it "rush[es]" to file a declaratory judgment action in federal court in hopes of "preempt[ing] any state court proceeding." Under these circumstances, the federal case is still deemed "reactive" to the state case, and the district court should consider dismissing the federal case pursuant to its discretion under the Act. *Continental Casualty Company v. Robsac Industries,* 947 F.2d 1367, 1372–73 (9th Cir.1991).

■ The instant action, however, is distinct from either of the above types of cases. The federal action here is neither "reactive" to, nor duplicative of, any parallel state proceeding. There was no state action pending in state court when Maryland filed this action in March of 1992.[5] Nor is there any indication that Maryland hastily commenced the action in anticipation of Knight filing a similar case in state court. *Cf. Robsac,* 947 F.2d at 1372. Indeed, Knight did not file any state court action until October 1993, over nineteen months after Maryland filed its complaint in the district court and one month after Maryland obtained summary judgment on it. Even then, Knight's state court suit was against only third parties (SDIR and its guarantors), and only indirectly involved some of the issues already then decided by the pre-existing federal summary judgment.

Cases, such as this one, "in which there are no parallel state court proceedings," lie at the "outer boundaries" of the district court's discretion under the Declaratory Judgment Act. *Wilton,* —— U.S. at ——, 115 S.Ct. at 2144. The United States Supreme Court has expressly declined to rule on whether it is appropriate for a district court to exercise its discretion to decline jurisdiction under such circumstances. *Id.* For the reasons discussed below, we find that such an exercise of discretion would have been unnecessary, if not inappropriate, in this case.

First, as discussed, there was no pending or impending state court suit at the time the federal action was filed. As such, there was little reason for the district court to consider dismissing this case.

Second, dismissal in this case would not have spared the district court the task of determining issues of state law. See *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361, 1366–68 (9th Cir.1991). Because there existed an independent basis for jurisdiction over Knight's counterclaim (diversity of citizenship), even if the district court had chosen to dismiss the declaratory relief complaint, the counterclaim would still be pending before the court.[6] The result of dismissing the declaratory relief complaint would therefore have been "piecemeal litigation: the federal court would have been left with the [counterclaim] for monetary relief, and the state court would have had to decide the declaratory relief claim." *Robsac,* 947 F.2d at 1373–74, discussing *Chamberlain,* 931 F.2d at 1366–68. The Declaratory Judgment Act was intended to avoid, not promote, such a result.

Third, the timing of the filing of Knight's state court action strongly suggests that, if anything, the state action was "reactive" to the federal action. Knight was apparently content to adjudicate the insurance coverage issue of the gun range equipment claim by means of Maryland's declaratory judgment action in federal court. Only *after* the district court ruled in favor of Maryland on the insurance coverage issue did Knight elect to

---

5. The propriety of the district court's exercise of jurisdiction is judged as of the time of filing. *Karussos,* 65 F.3d at 800; *Hungerford,* 53 F.3d at 1016.

6. The district court did not have discretion to dismiss the counterclaim pursuant to 28 U.S.C. § 2201.

seek compensation for the alleged loss directly by suing SDIR in state court.

Lastly, the interests of judicial economy would not be served by dismissing this action. This case was fully litigated by the parties, and proceeded to a judgment on the complaint and jury verdict on the counterclaim. In addition, for the reasons set forth below, the case was correctly decided by the district court. To dismiss the case at this stage, requiring the parties to refile in state court, would be wasteful and unnecessary. *Cf. Robsac,* 947 F.2d at 1374 ("[W]here a district court improperly exercised jurisdiction to grant a declaratory judgment, but nonetheless reached a correct decision on the merits, it would, at least in some circumstances, be a waste of judicial resources for the court of appeals to vacate the judgment in order for a state court to duplicate the district court's efforts.").

Under these circumstances, we find that the district court was under no obligation to exercise its discretion to decline jurisdiction. To the extent that the district court was required to exercise its discretion at all, its apparent failure to do so [7] was invited by the parties and does not require remand. Pursuant to Fed.R.Civ.P. 61, this court is required to "disregard any error or defect which does not affect the substantial rights of the parties." *See also* 28 U.S.C. § 2111. In this case, the district court's assumption of jurisdiction was proper. Its failure to state its reasons for exercising jurisdiction on the record is at most harmless legal error, and shall be disregarded.

We now turn to the merits.

**B. Gun Range Equipment**

■ Knight contends the district court erred by concluding on summary judgment

that his insurance policy did not cover the gun range equipment installed and removed by SDIR. Review of this issue is de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994).

■ Under California law, "[w]hen a person affixes his property to the land of another, without an agreement permitting him to remove it, the thing affixed ... belongs to the owner of the land." Cal. Civ. Code § 1013; *Goldie v. Bauchet Properties,* 15 Cal.3d 307, 313, 124 Cal.Rptr. 161, 540 P.2d 1 (1975). There are two exceptions. The first exception is when the parties agree to some other classification. *Id.; see also Clawson v. Harris,* 10 Cal.App.2d 521, 522–23, 52 P.2d 496 (1935). The second exception is for trade fixtures, as set forth in Cal. Civ.Code § 1019:

> A tenant may remove from the demised premises, any time during the continuance of his term, anything affixed thereto for purposes of trade, manufacture, ornament, or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises.

"The legal conclusion 'trade fixture' means that the goods so denominated will be treated as personal property, i.e., that the tenant may remove the goods upon termination of the lease." *Goldie,* 15 Cal.3d at 316, 124 Cal.Rptr. 161, 540 P.2d 1.

■ In the present case it is undisputed that SDIR purchased and installed the gun range equipment, which was used in the course of SDIR's business. Moreover, the operative lease between Knight and his tenant, SDIR, clearly classifies the gun range equipment as a "trade fixture." [8] It thus

---

7. The trial record reveals no mention of the exercise of discretionary jurisdiction by the trial court or that the parties ever raised the issue.

8. The lease provides the following definitions:
*Tenant's trade fixture*-any property installed in or on the premises by Tenant for purposes of trade, manufacture, ornament, or related use. *Tenant's personal property*-Tenant's equipment, furniture, merchandise, and movable property placed in the premises by Tenant, including tenant's trade fixtures, as defined herein.

The Recitals section of the lease states that the lease is made with reference to the following fact:
> During the lease term, *Tenant obtained permits, made alterations, and installed trade fixtures for an indoor shooting range which tenant operates* along with the racquetball and fitness center. [Emphasis added].

appears from the evidence presented at the time of the motion that the gun range equipment falls within the statutory definition of trade fixture.

Knight contends the lease was entered into in order to eliminate SDIR's rights to the gun range equipment, but fails to point to any language in the lease meant to achieve this objective. Knight also argues that even if the lease characterized the gun range equipment as a trade fixture, it was not a trade fixture under Cal. Civ.Code § 1019 because it could not be removed without damage to the leasehold. Knight, however, identifies no evidence before the district court at the time of the hearing to support this contention. Moreover, such an argument ignores California law which holds that parties may agree to almost any classification of their property between themselves, and the law will respect such agreements. *Goldie*, 15 Cal.3d at 313, 124 Cal.Rptr. 161, 540 P.2d 1.

█ We conclude that pursuant to the terms of the lease agreement, the gun range equipment is a "trade fixture" and considered SDIR's personal property. Because Knight's policy did not cover the personal property of others, the gun range equipment was not covered by the policy. SDIR had the right to remove its personal property from the premises, and the district court correctly held that this removal did not represent an insurable loss to Knight.

### C. Rule 54(b) Motion To Revise

█ Eight months after the district court entered summary judgment on Maryland's claim regarding the gun range equipment, Knight brought a motion to revise the order pursuant to Federal Rule of Civil Procedure 54(b).[9] On appeal, Knight failed to make any substantive argument why the district court's denial of his motion was erroneous. We deem Knight's appeal of this issue abandoned. *See, e.g., American Int'l Enters., Inc. v. FDIC*, 3 F.3d 1263, 1266 n. 5 (9th Cir.1993) ("Issues raised in the brief that are not supported by argument are deemed abandoned.").

### D. Replacement Cost

With respect to the building replacement cost, the district court held that: (1) Maryland had no duty to indemnify Knight for the replacement cost of the building until he actually repairs or replaces the building; and (2) the amount of Knight's recovery for replacement cost would be the lesser of either the appraisal estimate for the replacement cost loss ($752,873.90), or the amount actually spent to repair or replace the building. The panel reviews de novo the district court's rulings on summary judgment. *Jesinger*, 24 F.3d at 1130.

#### 1. Is actual replacement required for replacement cost?

Knight contends he is entitled to the replacement cost of the building without actually replacing it, for three reasons: first, he argues the policy language is ambiguous and should be construed against the drafter; second, he argues Maryland should be estopped from enforcing a provision unfair to the insured; and third, he argues Maryland's interpretation of the policy violates Cal. Ins. Code §§ 2070 and 2071.

##### a. Ambiguity

█ "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). Where the terms of an insurance policy are ambiguous, a court must interpret the policy in the sense in which the insurer believed the insured understood it. *Id.* at 1264–65, 10 Cal.Rptr.2d 538, 833 P.2d 545; *see also Continental Ins. Co. v. Superior Court*, 37 Cal. App.4th 69, 82, 43 Cal.Rptr.2d 374 (1995). This rule protects the objectively reasonable expectations of the insured. *Bank of the West*, 2 Cal.4th at 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545. Only when this rule does not eliminate the uncertainty is ambiguous language construed against the drafter. *Id.*

The form of the policy Knight purchased, at an additional premium, includes the following "Loss Payment" provision:

9. Rule 54(b) allows a court to revise an order adjudicating less than all the claims in an action.

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

\* \* \* \* \* \*

f. We will pay for covered loss or damage within 30 days after we receive the sworn statement of loss, if:

(1) You have complied with all of the terms of this Coverage Part; and

(2) (a) We have reached agreement with you on the amount of loss; or

(b) An appraisal award has been made.

The provision regarding options a.(2) or a.(4) above for Replacement Cost further states, in subsection d:

We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

▮ Knight argues the above provisions are ambiguous because the requirement that the damaged property actually be repaired before payment conflicts with the "Loss Payment" provision requiring Maryland to make payment within 30 days. We disagree. There is no conflict between the 30-day payment provision and the requirement that the damage be repaired prior to payment. Under the terms of the policy, Maryland must make payment within 30 days only if Knight has complied with all the terms of the coverage. One of these terms unambiguously requires that "the lost or damaged property is actually repaired or replaced" prior to payment of replacement costs. Because Knight did not comply with this policy term, Maryland's obligation to pay replacement costs was not triggered under the policy.

### b. Estoppel

▮ Knight alternatively contends Maryland should be estopped from requiring him to replace the building before receiving the replacement cost, because it is unreasonable to require an insured to pay the costs of replacing an insured building without the benefit of any insurance money to pay for the construction. This may be true, but it is clear from both the terms of the policy and the facts of this case, that under the Maryland policy an insured may receive the actual cash value of the loss immediately. These funds may be used to make repairs or replacement.[10] Similar replacement cost policy provisions have repeatedly been found enforceable and free from ambiguity. *O–So Detroit, Inc. v. Home Ins. Co.,* 973 F.2d 498 (6th Cir.1992); *Dickler v. CIGNA Property and Cas. Co.,* 957 F.2d 1088 (3rd Cir.1992); *Kolls v. Aetna Cas. and Sur. Co.,* 503 F.2d 569 (8th Cir.1974); *Lerer Realty Corp. v. MFB Mut. Ins. Co.,* 474 F.2d 410 (5th Cir. 1973).

Knight in fact received slightly more than the actual cash value of his loss within 30 days of submitting his sworn statement of loss. Because of a dispute between Knight and the loss payee on the policy, Knight could not gain access to these funds. Nevertheless, Maryland made payment of the actual cash value of the loss to the appropriate parties, which payment could have been immediately applied toward the repair and replacement.

---

**10.** Subsection "c" of the "Replacement Cost" provision states:

You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if

you notify us of your intent to do so within 180 days after the loss or damage.

The case upon which Knight relies, *Zaitchick v. American Motorists Ins. Co.,* 554 F.Supp. 209 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir. 1983), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983), is distinguishable, because in that case the insurer made no payment at all to the insured.

### c. California Insurance Code Section 2070

Knight finally contends the policy's replacement cost provision violates Cal. Ins. Code § 2070, which requires all fire insurance policies to be on the "standard form" or in a form substantially equivalent or more favorable to the insured. Cal. Ins.Code § 2070. The requirements of the standard form are set out in Cal. Ins.Code § 2071, and provide in pertinent part as follows:

The amount of loss for which this company may be liable shall be payable 60 days after proof of loss ... is received by the company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by the filing with this company of an award as herein provided....

The Maryland policy's provision for payment of the actual cash value within 30 days after the appraisal award is issued and after the insured complies with all policy terms is more favorable than the sixty-day period in the standard form. Moreover, by providing for the option of replacement cost in excess of the actual cash value, Maryland's policy assumes a greater liability than the standard form. As such, the policy replacement cost provision does not violate the California Insurance Code.

We conclude the district court did not err in deciding that the policy required Knight to actually repair or replace the building before Maryland will pay replacement cost.

### 2. Amount of Loss

The Replacement Cost provision in the Maryland policy provides at subsection e that Maryland will pay the least of three possible replacement cost assessments:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same premises, the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Maryland thus must pay the least of the policy limit, the appraised replacement cost, or the actual replacement cost.

In this case an appraisal panel estimated that the cost to repair or replace Knight's building, on the same premises, with property of comparable material and quality and used for the same purpose, would be $752,870. If Knight actually repairs or replaces this building within the terms of the policy, then the amount he is due will be the cost of his actual expenses or $752,870, whichever is less.[11]

Knight argues that if he is entitled to replacement cost only upon actual replacement, then he must be entitled to the cost of actual replacement. Knight cites no authority for this proposition, and this is clearly not what the policy provides.

Knight also argues that the court's construction of the policy would make the appraisal award an idle act if in fact payment must await actual replacement. Knight contends the appraisal option only makes sense if actual replacement is not required. Knight apparently thinks the actual replacement costs could only be the same or less than the appraisal figure. If Knight decides to build a better building, however, the actual cost of replacement could be higher, and Knight's recovery of such a figure is not provided over the appraisal figure.

We conclude the district court properly held that upon actual repair or replacement Knight is entitled to either $752,870 or the actual cost, whichever is less.

### E. Admission of Settlement Evidence

Knight contends the district court erred by admitting evidence of Knight's settlement with the Bank, because the evidence was irrelevant to any issue at trial. The district court ruled that if Knight intended to introduce evidence of emotional distress resulting from his Chapter 11 bankruptcy proceeding, then Maryland would be allowed to introduce

---

11. The policy limit exceeds $752,870.

evidence of Knight's settlement with the Bank to show that in fact Knight was substantially economically benefitted, and thus potentially suffered less emotional distress.

■ Evidentiary rulings are reviewed for an abuse of discretion, and will not be reversed absent some prejudice. *City of Long Beach v. Standard Oil Co.*, 46 F.3d 929, 936 (9th Cir.1995).

■ Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The district court did not abuse its discretion in admitting this evidence. Knight filed for bankruptcy to forestall the Bank's foreclosure on the property. The fact that the settlement came out substantially in his favor suggests that declaring bankruptcy enhanced Knight's negotiating position with the Bank, and ultimately worked to his benefit.

■ Besides being relevant to the claim of emotional distress, the settlement was also relevant to the extent of economic damages on the bad faith claim. It was Maryland's contention that even if it did unreasonably delay resolution of Knight's claim, that delay caused Knight no damages in the end; in fact, Maryland contended Knight was economically benefitted. The jury apparently agreed. By special verdict form, the jury found Maryland had unreasonably delayed its handling of the claim, but that Knight had not been damaged by the negligence.

We conclude the district court's admission of the settlement evidence was well within the district court's discretion.

### III

### CONCLUSION

For all the above reasons, we conclude the district court properly exercised jurisdiction

over this matter, and we affirm as to all other issues upon appeal.