[No. B088208. Second Dist., Div. One. Jan. 10, 1996.]

LAUGHLIN E. WATERS et al., Plaintiffs and Appellants, v.
UNITED SERVICES AUTOMOBILE ASSOCIATION, Defendant and
Appellant.

1064

**COUNSEL**

Shernoff, Bidart & Darras, William M. Shernoff, Frank N. Darras and Sharon J. Arkin for Plaintiffs and Appellants.

Guy O. Kornblum, William A. Cerillo, Samuel M. Zaif, Lisa M. Lacy, Daniels, Baratta & Fine and Paul R. Fine for Defendant and Appellant.

**OPINION**

**VOGEL (Miriam A.), J.**—In this first party insurance bad faith case arising from a dispute about the restoration of the insureds' fire-damaged house, United Services Automobile Association (USAA) appeals from a judgment entered on a jury's award of $1,375,000 in emotional distress damages to the insureds, Laughlin E. and Voula D. Waters. USAA contends the judgment must be reversed because the insureds failed to prove they suffered any financial loss of any kind. We agree, and therefore do not reach USAA's other claims of error or the issues raised on the Waters' protective cross-appeal.

FACTS

On December 17, 1990, a fire caused substantial damage to the Waters' elegant Hancock Park home. At that time, the Waters were insured by USAA under a homeowner's policy, with limits of $1,615,000 for the dwelling; $1,615,000 for unscheduled personal property; $323,000 for loss of use or additional living expense (ALE); and additional coverage for clean up and emergency repair expenses.[1] The fire was immediately reported to USAA, and a USAA claims adjuster (Kevin Bushaw) met the Waters at their house the day of the fire to explain the policy's benefits and to give the Waters a $50,000 check to cover their immediate needs.[2] Over the next two days, Mr. Bushaw and other USAA employees spent a substantial amount of time at the Waters' home. The Waters told Bushaw that their son (Laughlin Waters, Jr.) was an experienced commercial building contractor who happened also to be intimately familiar with the house (he grew up in it) and the Waters asked if their son's company (TMLC) could do the restoration work. Although Mr. Waters had no experience in the restoration of fire-damaged residences, USAA agreed.

From January to May 1991, Mr. Bushaw regularly met with, talked to and corresponded with Judge Waters and Mr. Waters about the restoration of the Waters' home. Early on, Mr. Bushaw used a commercially available computer program ("Comp-U-Claim") to prepare his initial reports estimating the scope of the project and the required repairs, and came up with estimates ranging from $116,000 to $161,000.[3] On January 31, in response to USAA's insistence that a bid in some amount had to be submitted by TMLC, Mr. Waters submitted a "worst case" estimate of $605,007. On February 7, Mr. Waters sent in a revised estimate of $390,655 but Mr. Bushaw believed this amount was still too high and, with Judge Waters' permission, USAA

---

[1] Judge Waters (a senior federal district court judge) is a retired military officer and thus eligible for membership in USAA and for the coverage the Waters had on the house.

[2] Although some confusion later arose about whether USAA intended the $50,000 to apply to ALE benefits or toward the dwelling restoration, the Waters' assertion on appeal that USAA withheld ALE benefits "for four months" is unsupported by the record. As permitted by the policy, the Waters chose the reasonable rental value of their home as the basis for their ALE benefits, and the Waters and USAA agreed that, for up to 12 months, the Waters would receive $11,000 per month for each month they were out of their house. ALE benefits were paid when due (and there was no claim in the subsequently filed lawsuit that USAA mishandled the payment of ALE benefits). Indeed, our review of this very lengthy record has failed to disclose any evidence suggesting that the Waters had to reach into their own pockets for housing or any other needs arising from the fire. In fact, the Waters were able to rent acceptable housing for about $2,000 per month.

[3] At trial, the Waters claimed that USAA used Comp-U-Claim as part of a scheme to force them to accept bids that were admittedly too low to restore their home to its pre-fire condition.

retained an experienced fire restoration contractor (Clark-Porche) to inspect the home and prepare an independent bid. To that end, Jeff Krug, Clark-Porche's vice-president, met with Judge Waters and spent several hours touring the damaged house and discussing the restoration claim.

On February 18, Clark-Porche submitted a written bid of $223,859. On February 21, Mr. Waters submitted another revised estimate of $433,408 and, on the same day, Mr. Bushaw met with Judge Waters and Mr. Waters to discuss the bids. On March 11, Mr. Bushaw again met with Judge Waters and Mr. Waters. At that time, Mr. Bushaw presented Clark-Porche's revised bid of $251,407.28 and Mr. Waters lowered his estimate to $402,119.49. Mr. Bushaw then agreed to increase the Clark-Porche bid to $287,589.60 but the parties agreed that TMLC's bid needed further revisions.[4]

On March 29, Judge Waters wrote to USAA, complaining about its handling of his dwelling restoration claim. In response, a senior claims adjuster from USAA's home office (Bill Hooper) flew to Los Angeles to assist with the claim. Mr. Hooper reviewed the bids, met with Clark-Porche's representatives, and concluded that Clark-Porche's bid was sufficient to restore the home to its pre-fire condition. On April 11, Mr. Hooper and Mr. Bushaw met with the Waters and Mr. Waters.[5] To settle the dwelling restoration dispute, Mr. Hooper offered to have Clark-Porche do the repair and restoration work, with a guarantee by USAA that the house would be restored to its pre-fire condition and with Mr. Waters paid to oversee the work to ensure that the house was, in fact, restored to its pre-fire condition.

The Waters rejected this offer and, at the same April 11 meeting, submitted a newly revised bid from TMLC for $535,000. Although no agreement was reached, Mr. Bushaw gave the Waters a check for $91,429.24 for ALE coverage and emergency repairs done shortly after the fire. As of April 11, therefore, USAA had paid the Waters $141,429.24, and the parties agreed to continue to negotiate the restoration bids, with TMLC's $402,000 bid (from March 11) as the starting point. On May 14, Mr. Bushaw again met with Mr.

---

[4]The numerous revisions were required, at least in part, because the Waters were adamant about restoring the house to its pre-fire first-class condition (it had solid mahogany doors, a triple-layer Spanish tile roof, hardwood flooring and other custom details). Some of USAA's bids included cheap substitutes (e.g., plywood instead of hardwood floors in two back bedrooms, paint instead of wallcoverings where they had been before the fire, plain pine doors to replace Philippine mahogany inlaid doors, and so on) which were unacceptable to the Waters.

[5]At trial, Judge Waters testified that Mr. Bushaw had warned the Waters that unless they did what Mr. Hooper told them to do and accepted his figures, Mr. Hooper would bring them "to their knees" as he had with other fire victims.

Waters and considered another revised estimate from TMLC, this time for $442,633.35. After that meeting, Mr. Bushaw met with Clark-Porche's representatives and, based on upgrades requested by Mr. Bushaw, Clark-Porche's estimate was increased to $301,019.38.

On May 30, USAA sent the Waters a written offer to settle their dwelling restoration claim for $419,963.71, enclosing a check in the amount of $269,454.48 (the undisputed portion of the claim). Although the Waters rejected the offer, they retained and cashed the check and thus had in hand, as of that date, the $50,000 paid the day after the fire, the $91,429.24 paid on April 11, and the $269,454.48 paid on May 30, a total of $410,883.72.[6]

On June 20, the Waters formally rejected USAA's May 30 offer and, on July 5, they sued USAA in federal court. Shortly thereafter, USAA increased its $419,963.71 offer and agreed to have TMLC perform the repairs on a "cost plus-guaranteed maximum basis" for an amount not to exceed $424,633.35. In other words, USAA accepted the amount of TMLC's May 14 bid, less $18,000 resolved in the interim. On August 21, the Waters accepted this offer and, as agreed by the parties, USAA deposited the money to its lawyer's trust account. As the work was done, USAA's lawyer was to review it and could, if appropriate, challenge specific expenditures. The work was thereafter completed within the agreed cost, in a reasonable time and to the Waters' complete satisfaction.

The payment for the dwelling restoration work was without prejudice to the Waters' right to pursue their bad faith claim, and they did so (but in state court, not federal court, after USAA had the federal action dismissed on the ground diversity was lacking).[7] At trial to a jury, the Waters and USAA

---

[6]This figure does not include USAA's payments for the replacement of damaged or destroyed personal property, for which the Waters eventually received over $500,000 from USAA.

[7]In response to USAA's motion to dismiss the federal court action, the Waters sought sanctions on the ground that USAA took inconsistent positions in various courts on the issue of diversity. The motion for sanctions was denied and, as noted in the text, the federal action was dismissed. Thereafter, this action was filed, alleging a single cause of action for bad faith (breach of the implied covenant of good faith and fair dealing). Thereafter (in November), USAA sent a letter to its California insureds discussing this case and the publicity it had received in various newspapers. Although portions of USAA's letter were admitted into evidence at trial and although USAA raises several issues on appeal arising from this letter and related documents, our resolution of this appeal on the damages issue makes the other issues moot, including those based upon the letter. For this reason, we do not recount the details of the letter or its surrounding circumstances.

presented detailed evidence of most of the facts summarized above.[8] In addition, the Waters put on evidence of their extreme emotional distress and outrage. Mrs. Waters testified that, based on USAA's conduct, she had twice collapsed and been hospitalized as the result of high blood pressure episodes and Judge Waters testified at length about his anguish and distress. But the Waters did not put on *any* evidence of any kind of financial loss—no medical or hospital bills paid (or even incurred), no attorney fees, no interest paid on borrowed funds, no interest lost because personal funds had to be advanced to cover restoration or other fire-related expenses, no loss of an investment opportunity because personal capital was committed to the restoration effort—in short, nothing to suggest the Waters spent a penny of their own (or lost income they would have otherwise received) as a result of USAA's delay in paying the amounts claimed under the policy.

The jury returned its verdict for the Waters, awarding $1 million to Judge Waters for his emotional distress and $500,000 to Mrs. Waters for her emotional distress (reduced to $375,000 by the jury's allocation of 25 percent of fault to Mrs. Waters). USAA's motion for judgment notwithstanding the verdict (on the ground that the emotional distress award could not stand absent proof of financial loss) was denied and USAA now appeals.

## DISCUSSION

■ USAA contends the judgment must be reversed because the Waters failed to prove any financial loss. The Waters concede they presented no proof of financial loss but claim it wasn't necessary because, in a "first party case," the "denial of, or delay in payment of, benefits is . . . sufficient." As we will explain, the decisions of the California Supreme Court do not support the Waters' position. Although there is ambiguous language in one Court of Appeal decision and arguably misleading comments in two treatises, the bottom line is that emotional distress damages are recoverable in first and third party bad faith cases only when the insureds have suffered a financial loss.

### A.

*We begin by defining our terms.*

■ "First party" insurance policies provide coverage for loss or damage sustained by the insured (e.g., life, disability, health, fire, theft and casualty

---

[8]The trial court excluded USAA's proffered evidence of the amounts it paid to the Waters for the replacement of their personal property, on the theory that, since the Waters were not claiming bad faith with regard to those payments, evidence about what USAA did or didn't do about the personal property claim was irrelevant.

insurance). "Third party" insurance policies provide coverage for liability of the insured to another (e.g., comprehensive general liability, directors and officers liability and errors and omissions insurance). (*Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 399, fn. 2 [257 Cal.Rptr. 292, 770 P.2d 704].)

"First party bad faith lawsuits" involve an insured's claims against the insurer under coverages written for the insured's direct benefit under a first party policy. (E.g., *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818-819 [169 Cal.Rptr. 691, 620 P.2d 141].) The gravamen of a first party lawsuit is a breach of the implied covenant of good faith and fair dealing by refusing, without proper cause, to compensate the insured for a loss covered by the policy (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032]), or by unreasonably delaying payments due under the policy (*Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1, 29-30 [148 Cal.Rptr. 653], disapproved on other grounds in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 824, fn. 7).

"Third party bad faith lawsuits" (as they exist post-*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58]) generally involve an insured's suit against his liability insurer arising out of the insurer's mishandling of a third party claim against its insured, such as by unreasonably refusing to settle within policy limits (*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 238 [178 Cal.Rptr. 343, 636 P.2d 32]) or unreasonably refusing to provide a defense in a third party action (*Tibbs* v. *Great American Ins. Co.* (9th Cir. 1985) 755 F.2d 1370, 1375). The older cases (based on *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], overruled by *Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d 287), involving a third party claimant's direct action against the carrier for a violation of Insurance Code section 790.03, subdivision (h), are also sometimes referred to as "third party bad faith cases."

B.

Both sides agree that, *in third party bad faith cases,* damages for emotional distress are recoverable only when the insured has suffered *some* financial loss. (See, e.g., *Gourley* v. *State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 128 [3 Cal.Rptr.2d 666, 822 P.2d 374].)[9] They part company, however, on the rules governing first party bad faith cases. Relying on *Sprague* v.

[9]Since it is conceded in our case that there was no financial loss of any kind or to any degree, we need not consider the extent of financial loss or the severity of the emotional

*Equifax, Inc.* (1985) 166 Cal.App.3d 1012 [213 Cal.Rptr. 69], and a comment in Croskey, Kaufman et al., California Practice Guide: Insurance Litigation (The Rutter Group 1995) paragraph 13:84, page 13-16, the Waters contend that, in first party cases, the insurer's denial of benefits is sufficient to satisfy the threshold requirement of economic loss and "[n]o additional loss or injury need be shown." Although *Sprague* does say that the "threshold requirement of economic loss was satisfied when [the carrier] initially . . . terminate[d] [the insured's] benefits" and that, "[f]rom then on, [the insured] was entitled to recover damages for his mental suffering proximately caused by the termination of benefits" (*Sprague* v. *Equifax, Inc.*, *supra*, 166 Cal.App.3d at p. 1031), that statement, taken out of context, ignores the facts of *Sprague* (actual financial losses were suffered by the insured) and also ignores the law previously announced (and subsequently reaffirmed) by the Supreme Court. We will now explain why *Sprague* is not dispositive.

## C.

The starting point is *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173], an action arising out of a liability insurer's refusal to settle a third party claim within policy limits. Although the third party claimant was willing to settle for $9,000 (within the policy's $10,000 limits), the carrier declined—and the third party then recovered a judgment for $101,000 against the insured. (*Id.* at pp. 427-428.) The carrier paid the $10,000 policy limits, leaving the insured to deal with the balance of the judgment. In a suit against the carrier, the insured recovered $91,000 (the balance due under the third party's judgment against her), plus interest on the $91,000, plus $25,000 for mental suffering. (*Ibid.*)

After explaining that tort liability for bad faith refusal to accept a reasonable settlement is based upon a breach of the implied covenant of good faith and fair dealing (*Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d at pp. 429-430), and holding that the rejection of a reasonable settlement offer subjects a carrier to liability for a judgment in excess of policy limits (*id.* at pp. 430-431), the Supreme Court went on to consider the propriety of the $25,000 award for mental suffering (*id.* at pp. 432-434). As relevant to the issue before us, this is what the Supreme Court held:

"We are satisfied that a plaintiff who as a result of a defendant's tortious conduct *loses his property and suffers mental distress may recover not only*

---

distress necessary to support emotional distress damages (issues presently pending before the Supreme Court in *Torres* v. *Automobile Club of So. California* (1995) 45 Cal.App.4th 1610 [43 Cal.Rptr.2d 147], review granted Sept. 28, 1995 (S048329)).

*for the pecuniary loss but also for his mental distress. . . .* The principal reason for limiting recovery of damages for mental distress is that to permit recovery of such damages would open the door to fictitious claims, to recovery for mere bad manners, and to litigation in the field of trivialities. . . . Obviously, *where, as here, the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of fictitious claims is reduced,* and we are not here concerned with mere bad manners or trivialities but tortious conduct resulting in substantial invasions of clearly protected interests." (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at pp. 433-434, italics added.)[10]

Under *Crisci,* therefore, emotional distress damages are recoverable in a bad faith action arising out of a third party claim only when the insured establishes a loss of property (in *Crisci,* that loss was the $91,000 the insured was required to pay to the third party claimant). Then, and only then, may the insured recover for emotional distress damages as well as the pecuniary loss.

### D.

The next case of interest is *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, a pleading case. When the insured's business was destroyed by fire, he was charged with arson. While the criminal charges were pending, his carriers (he had more than one policy) insisted that he appear for an examination under oath. When his attorney explained that he could not do so until the criminal charges were resolved, the carriers denied coverage. After the criminal charges were dismissed, the insured offered to appear for an examination but the carriers reaffirmed their denial of coverage. The insured sued for bad faith (that is, for breach of the implied covenant of good faith and fair dealing), alleging he had suffered severe economic damage, loss of earnings, various special damages, and severe emotional upset and distress. (*Id.* at pp. 570-572.) The carriers' demurrers were sustained and the case reached the Supreme Court on the insured's appeal. Among other things, the carriers asked the high court to hold that, as a matter of law, the insured could not recover for emotional distress because he had failed to allege conduct which was "extreme" and "outrageous." (*Id.* at pp. 578-579.)

In rejecting the carriers' position, the Supreme Court quoted from its earlier opinion in *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, emphasizing its holding that: " 'We are satisfied that a plaintiff who as a result of

---

[10]In a footnote, the Supreme Court emphasized that it was not asked in *Crisci* to decide whether a claim for emotional distress damages was actionable where there was no injury to person or property rights in addition to the inflicted mental distress. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 434, fn. 4.)

a defendant's tortious conduct *loses his property* and *suffers mental distress* may recover not only for pecuniary loss but also for his mental distress.' (Italics added.)" (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 579.) The *Gruenberg* court continued: "In *Crisci* we did not suggest that to warrant recovery for mental distress the conduct of the insured must be 'outrageous' or that the mental distress must be 'severe.' We explained that '[t]he principal reason for limiting recovery of damages for mental distress is that to permit recovery of such damages would open the door to fictitious claims, to recovery for mere bad manners, and to litigation in the field of trivialities. [Citation.] Obviously, where . . . the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of fictitious claims is reduced . . . .' " (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 579, quoting from *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 434.)

To dispel any doubt about the connection between emotional distress damages and pecuniary loss in the bad faith context, the Court continued: "Our decision in *Crisci* is consistent with section 46, Restatement Second of Torts, on which [the carriers] mistakenly rely. It states in part: 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' Comment 'a' to that section states that it is intended to apply only to the independent tort of intentional infliction of emotional distress. To be distinguished, comment 'b' explains, are those cases in which 'emotional distress may be an element of damages . . . where other interests have been invaded, and tort liability has arisen apart from the emotional distress.' The more exacting requirements of section 46 are applied, the same comment states, to the independent tort (i.e., intentional infliction of emotional distress) '[b]ecause of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability . . . .' Since in the instant case we are concerned with mental distress resulting from a substantial invasion of property interests of the insured and not with the independent tort of intentional infliction of emotional distress, we deem section 46 to be inapplicable.

*"Here, [the insured] alleged that he suffered substantial economic losses apart from mental distress. He alleged that he suffered loss of earnings; that he was compelled to go out of business and that as a result he was unable to pay his business creditors; that he incurred the costs of defending lawsuits brought against him by his creditors; and that he incurred medical expenses.* We conclude, therefore, that since [the insured] has alleged substantial

damages for loss of property apart from damages for mental distress, the complaint is sufficiently pleaded with respect to the latter element of damages." (*Gruenberg* v. *Aetna Ins. Co.*, *supra*, 9 Cal.3d at pp. 579-580, italics added.)

Under *Gruenberg,* therefore, emotional distress damages are recoverable in a first party bad faith case only when the insured establishes financial loss (in *Gruenberg,* the insured suffered lost earnings, was forced out of business, incurred legal fees in defending suits by creditors he was unable to pay because he could not rebuild his business, and incurred medical expenses). Then, and only then, may the insured recover for emotional distress damages as well as the pecuniary loss.

### E.

We next consider *Sprague* v. *Equifax, Inc.*, *supra*, 166 Cal.App.3d 1012, which, significantly, was *not* a bad faith case—it was pleaded and tried solely on theories of fraud and conspiracy to fraudulently terminate an insured's credit disability insurance benefits (and it was won solely on the conspiracy theory). (*Id.* at p. 1026.)[11] In *Sprague*, the insured borrowed money from his credit union, pledging his savings as security. He then purchased credit disability insurance so that, in the event he became totally disabled, up to $250 per month would be paid on his outstanding loan balance. (*Id.* at pp. 1021-1022.) The insured became disabled and, at first, the carrier made regular payments on the loan. After about 18 months, however, the benefits were terminated because the carrier determined that the insured was no longer disabled (a determination the jury later found was part of a scheme to defraud insureds). (*Id.* at pp. 1022-1023.) About three months after the benefits were terminated (and after the insured's attorney had written a letter objecting to the termination), the benefits were reinstated. (*Id.* at p. 1023.)

A jury awarded the insured $100,000 in "compensatory damages" and $5 million in punitive damages (reduced by the trial court to $1 million). On the carrier's appeal, it was *conceded* that the insured was entitled to "an award

---

[11]With the exception of *Sprague*, and except as necessary to distinguish the requirements of other torts, our analysis is limited to insurance bad faith cases. As the Supreme Court explained in *Crisci*, for example, there are significant differences between a cause of action for fraud and a claim alleging tortious breach of the implied covenant of good faith and fair dealing contained in every insurance contract (i.e., bad faith). (*Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d at pp. 430-431.) In our view, it serves no purpose to look to the proof requirements in other torts where, as in the case before us, there is ample authority governing the specific (and only) tort pleaded and tried.

of damages for emotional distress during th[e] period [during which benefits were terminated]." (*Sprague* v. *Equifax, Inc., supra*, 166 Cal.App.3d at p. 1029.) The only issue was whether the insured was entitled to additional damages for the emotional distress he continued to suffer after his benefits were reinstated. (*Ibid.*)

Relying (for reasons not stated) on the bad faith cases (*Crisci* and *Gruenberg*), *Sprague* begins its discussion of fraud damages with this statement: "An award of damages for emotional distress resulting from tortious termination of disability insurance benefits is not limited as a matter of law to the time during which the economic harm continues totally unabated. Those cases which have allowed emotional distress as an element of damages resulting from tortious breach of insurance contracts have required economic harm only to ensure, as a threshold matter, that an actual wrong has been committed against [the insured]." (*Sprague* v. *Equifax, Inc., supra*, 166 Cal.App.3d at p. 1030.) *Of course, by conceding the propriety of the emotional distress award ancillary to the initial denial of benefits, the carrier had necessarily also conceded the existence of the required economic harm.*

Without reference to that fact, however, the *Sprague* court went on to hold that the insured was entitled to recover for his continuing mental suffering: *"The threshold requirement of economic loss was satisfied when [the carrier] initially participated in fraudulently terminating his benefits. From then on, [the insured] was entitled to recover damages for his mental suffering proximately caused by the termination of benefits, for whatever length of time his mental suffering continued. . . .* [¶] After the threshold showing of economic harm was made, evidence that [the carrier] conditionally restored [the insured's] benefits went only to the quantity of damages, and the credibility of [the insured's] claim that he continued to suffer emotional distress, which were matters for the jury, and not to be reweighed on appeal." (*Sprague* v. *Equifax, Inc., supra*, 166 Cal.App.3d at p. 1031, italics added.)

The emphasized statement in the preceding paragraph, taken out of context, forms the basis of the Waters' claim that USAA's delay in finally resolving the dwelling restoration claim is, itself, a sufficient showing of economic loss. Of course, this view of *Sprague* ignores the fact that *Sprague* is not a bad faith case, and similarly ignores the fact that a financial loss sufficient to support emotional distress damages was conceded by the carrier —and they were only haggling over the amount. Accordingly, *Sprague* does

not support a conclusion that emotional distress damages are recoverable in a bad faith action absent some showing of economic loss.[12]

## F.

The Supreme Court's most recent discussion of this subject appears in *Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d 121, where the actual issue before the court was whether prejudgment interest under Civil Code section 3291 (which applies to actions to recover damages for personal injury) was recoverable on an award of compensatory and punitive damages in a bad faith case. As the court explained, prejudgment interest under Civil Code section 3291 is "not available in insurance bad faith actions because such actions are brought primarily to recover *economic loss* caused by the tortious interference with a property right, and any damages recovered for actual personal injury, including emotional distress, are incidental to the award of economic damages." (*Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 123.)

The opinion in *Gourley* is replete with variations on this theme. For example, the court observed that "both *Crisci* and *Gruenberg* emphasize that the nature of an insurance bad faith action is one seeking recovery of a *property* right, not personal injury." (*Gourley* v. *State Farm. Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 127.) A few paragraphs later, the Court noted that, in allowing an insured to recover for emotional distress damages flowing from an insurer's breach in *Crisci*, the court "recognized that the bad faith action is not a suit for personal injury, but rather 'relates to financial damage.' " (*Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 128.) In the next paragraph, the court quoted from *Gruenberg*, emphasizing its reference to " 'mental distress resulting from a substantial invasion of property interests.' " (*Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 128.)

---

[12]In addition to *Sprague*, the Waters rely on a statement in the Rutter publication (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 13:84, p. 13-16). For the reasons explained in our discussion of *Sprague*, we believe the Rutter Group's statement is incorrect. The statement appears in the chapter on damages in bad faith actions under the heading, "Economic loss required" (which correctly describes the rule) and the sub-heading, "First party cases—denial of benefits sufficient." The full quote from paragraph 13:84 is this: "In first party cases, the insurer's withholding benefits due the insured satisfies the threshold requirement of economic loss. No additional loss or injury need be shown: 'The threshold requirement of economic loss was satisfied when appellants initially terminate(d) his benefits. From then on, plaintiff was entitled to recover damages for his mental suffering proximately caused by the termination of benefits, for whatever length of time his mental suffering continued.' [*Sprague* v. *Equifax, Inc.*, *supra*, 166 Cal.App.3d] at 1031 . . . ." Since this particular Rutter book was published after the Waters' trial was concluded, we need not be concerned that the Waters' case was filed or tried the way it was in reliance on this mischaracterization of *Sprague*.

Having said that, the Supreme Court then cited *Sprague* v. *Equifax, Inc.*, *supra*, 166 Cal.App.3d at pages 1029-1031, for the proposition that: "Thus, once the threshold requirement of economic loss is met, the insured need not show additional loss or injury to recover damages for his mental distress as long as such damages were proximately caused by his insurer's breach of the implied covenant." (*Gourley* v. *State Farm Mut. Auto. Ins. Co., supra*, 53 Cal.3d at p. 128.) In this context, it cannot be said that the Supreme Court has endorsed the Waters' interpretation of *Sprague*. To the contrary, the Supreme Court reinforced the need for a threshold showing of financial loss before emotional distress damages may be recovered.

*Gourley* is of interest for another reason. To further support its conclusion that a bad faith action is not one for personal injury, the court discussed the decision in *Richardson* v. *Allstate Ins. Co.* (1981) 117 Cal.App.3d 8, 12-13 [172 Cal.Rptr. 423], a statute of limitations case holding that bad faith actions are not limited by the one-year statute applied to infringements of personal rights but rather to the two-year statute—because bad faith actions are based on the infringement of property rights. (See *Gourley* v. *State Farm Mut. Auto. Ins. Co., supra*, 53 Cal.3d at pp. 128-129.) In the course of endorsing the *Richardson* rationale, the Supreme Court quoted the following passage from that case: " 'Breach of the implied covenant of good faith is actionable because such conduct causes financial loss to the insured, and *it is the financial loss or risk of financial loss* which defines the cause of action. Mental distress is compensable as an aggravation of the financial damages, not as a separate cause of action.' " (*Gourley* v. *State Farm Mut. Auto. Ins. Co., supra*, 53 Cal.3d at p. 129, quoting *Richardson* v. *Allstate Ins. Co., supra*, 117 Cal.App.3d at p. 13.)

Grasping at the emphasized phrase from *Gourley* (which is really a quote from *Richardson*), the Waters contend the *risk of financial loss* is, by itself, sufficient. In the context of our case, they claim that the *possibility* that USAA might not have paid the full amount claimed for the dwelling restoration is sufficient. We disagree. The paragraph in which the reference to "risk of financial loss" in *Richardson* appears is followed by a citation to *Gruenberg*. Although *Gruenberg* clearly supports the rest of the paragraph, it does not use the words "risk of financial loss" and we have no idea where they came from. The fact that they are quoted in *Gourley* is not sufficient to persuade us that the Supreme Court intended to attach some independent meaning to that phrase.

Any doubt about this conclusion is resolved by reference to the paragraph in *Gourley* immediately following the Supreme Court's discussion of *Richardson* where, once again, the emphasis is placed on actual financial loss:

"[W]e believe the same principles [announced in *Richardson*] apply in the present case. Breach of the implied covenant is actionable in the insurance context because such conduct causes financial loss to the insured, and it is that loss which defines the cause of action." (*Gourley* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 129.)

Accordingly, *Gourley* supports the view that actual (not merely potential) financial loss must be established before an insured can recover emotional distress damages in a bad faith case. (See also *Continental Ins. Co.* v. *Superior Court* (1995) 37 Cal.App.4th 69, 85 14 [43 Cal.Rptr.2d 374] [denying a carrier's petition for a writ compelling the trial court to grant summary judgment but noting that, because "on remand it may be determined that [the insureds] did indeed suffer no economic loss," the rule is that "a claim for emotional distress in a bad faith action cannot stand alone, but must be accompanied by some showing of economic loss"]; compare Ashley, Bad Faith Actions (1995) § 8:04 [questioning whether California requires financial loss to support emotional distress damages but not citing or discussing *Gourley*.)

## G.

In *every* other bad faith case we have found in which emotional distress damages were upheld, there was some evidence of actual financial loss suffered by the insured. (See for example, *Egan* v. *Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d at pp. 817, 824, fn. 7 [affirming an award of emotional distress damages of $78,000 supported by a financial loss of $45,600 for future policy benefits]; *Fleming* v. *Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 38 [206 Cal.Rptr. 313] [affirming an award of emotional distress damages of $12,771.68 supported by a financial loss of $1,528.32 for attorney fees and costs of suit]; *Blake* v. *Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 925 [160 Cal.Rptr. 528] [holding that the trial court should have granted the carrier's motion for judgment notwithstanding the verdict on the ground (among others) that the plaintiff's claim for emotional distress damages was unsupported by a showing of any "consequential" damages]; *Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 658-659 [155 Cal.Rptr. 843] [affirming a jury's award of emotional distress damages where insureds spent $850 on attorney fees to prosecute an underlying claim]; Noghrey v. The Charter Oak Fire Insurance Company (U.S. Dist. Ct. (N.D.Cal.), 1995, No. C-95-2279.) [granting summary judgment to a carrier because the

insured was unable to establish any financial loss to support a claim for emotional distress damages].)[13]

Conversely, the *only* cases in which emotional distress damage awards have been affirmed absent any showing of financial loss are those in which the claim pursued was for intentional infliction of emotional distress or some other cause of action, not for the tort of bad faith. (See for example *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 385 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [the insured's other claims were disposed of by stipulation and motion and the only cause submitted to the jury was for intentional infliction of emotional distress].)[14]

## H.

We come now to this case. According to the Waters, USAA is confusing "the concept of financial *hardship* with the concept of economic

[13]Most other states agree with California's approach. For example, in *State Farm Mut. Auto. Ins. Co.* v. *Shrader* (Wyo. 1994) 882 P.2d 813, 833-834, a bad faith action arising out of the carrier's dealings with an uninsured motorist claim which resulted in a verdict for the insured, the carrier claimed on appeal that emotional distress damages should not have been included in the insured's award. The Wyoming Supreme Court disagreed but imposed the same limitation as *Gruenberg*: "We hold the scope of available compensatory damages for a breach of the duty of good faith and fair dealing includes damages for harm to pecuniary interests and emotional distress. . . . There is a limitation, however, upon the recovery of damages for emotional distress for a breach of this duty. . . . We agree with the court in Gruenberg, that to recover damages for emotional distress, the insured must allege that as a result of the breach of the duty of good faith and fair dealing, the insured has suffered substantial other damages, such as economic loss, in addition to the emotional distress. . . . The economic losses may include loss of earnings, inability to pay creditors, loss of business, costs of litigation brought against the insured as a result of the breach and medical expenses. . . . This limitation is imposed to prevent fictitious claims for emotional distress and preserve judicial resources." In *Filasky* v. *Preferred Risk Mut. Ins. Co.* (1987) 152 Ariz. 591 [734 P.2d 76, 82-83], the Arizona Supreme Court upheld an award of emotional distress damages in a bad faith case because, among other things, it "resulted in an invasion of property rights" by requiring the insured to "incur economic losses of approximately $4000 in attorneys' fees." In *Smith* v. *American Family Mut. Ins. Co.* (N.D. 1980) 294 N.W.2d 751, 761 [20 A.L.R.4th 1], the North Dakota Supreme Court validated an award of emotional distress damages in a bad faith case because the insured had lost his job and also lost other employment opportunities. (See also *Tynes* v. *Bankers Life Co.* (1986) 224 Mont. 350 [730 P.2d 1115, 1127]; *Anderson* v. *Continental Ins. Co.* (1978) 85 Wis.2d 675 [271 N.W.2d 368, 378]; *Farmers Group, Inc.* v. *Trimble* (Colo.App. 1988) 768 P.2d 1243, 1246; *Timmons* v. *Royal Globe Ins. Co.* (Okla. 1982) 653 P.2d 907, 916; but compare *Braesch* v. *Union Ins. Co.* (1991) 237 Neb. 44 [464 N.W.2d 769, 778].)

[14]In *Frazier* v. *Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90 [214 Cal.Rptr. 883], an emotional distress award was upheld without a showing of financial loss (apart from denial of double indemnity benefits), without explanation and only after the court held that, in that particular case, the claim of breach of the implied covenant of good faith and fair dealing sounded in contract, not tort, and thus reversed an award of punitive damages. (*Id.* at pp. 100-101, 105-108.)

*harm,"* and it is immaterial, they say, that they "were not driven into the poorhouse by USAA." It is enough, they contend, that they were denied the benefits of their policy for several months. As the cases discussed above demonstrate, the Waters are mistaken—and the "harm" or "hardship" they are talking about is the emotional distress they suffered as a result of the delay in resolving the dispute about their dwelling restoration claim. However real that distress was (and we do not question that it was substantial), it was not "economic" or "financial" harm. It did not involve any pecuniary loss. (*Continental Ins. Co.* v. *Superior Court, supra,* 37 Cal.App.4th at p. 85, fn. 11 [a delay in paying policy benefits, even if unreasonable, does not in itself establish financial loss to the insured].)

To the extent there is any confusion in the cases and the treatises, it may have something to do with the difference between the older and newer cases. In the old days, when an insurance company was sued because it denied coverage (for example, when a business burned down) or because the carrier terminated continuing monthly disability payments, the carrier did not pay until forced to do so by a final judgment against it. Today, it appears to be more common for a carrier to do an immediate about-face when it is sued, presumably with the hope of limiting its liability for continuing emotional distress and punitive damages. Whatever pros and cons there may be to this tactic, and whatever effect it may have on the *extent* of economic loss suffered by the insured (or on the formula used to calculate emotional distress or punitive damages), we do not believe it affects the rule that some financial loss is required to support an award of emotional distress damages.

We are not suggesting the Waters (or anyone else) must end up in the poorhouse before claiming emotional distress damages. Consistent with the existing cases, we are simply holding that *some* financial loss must be shown—to reduce the risk of fictitious claims and those based simply on bad manners, and to avoid litigation over trivialities. (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 579.) Indeed, the ability to validate emotional distress damages is critical where, as here, the carrier's bad faith consists of delay in the form of continuing negotiations. While it is true that an insured bargains for prompt payment, not a right of action against the insurer, the "insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through the payment of meritless claims. Such a practice inevitably would prejudice the insurance-seeking public because of the necessity to increase rates, and would finally drive the insurer out of business. Indeed, analysis of the leading first party cases demonstrates that a

rule has never been applied which holds under any circumstances that an insurer which refuses to pay benefits claimed to be due under the policy did so at its own risk. Clearly, both logic and good policy dictate that no such rule ever be applied in first party cases." (*Austero* v. *National Cas. Co.*, *supra*, 84 Cal.App.3d at p. 30; see also *McCormick* v. *Sentinel Life Ins. Co.* (1984) 153 Cal.App.3d 1030, 1042-1043 [200 Cal.Rptr. 732].)

In our case, the jury found that USAA did not negotiate in good faith—to the contrary, the jury found that USAA acted in bad faith—and we accept that finding. But the jury did not, and could not on this record, find that the Waters suffered any financial loss of any kind. As a result, there is absolutely no way under existing law to validate the award of emotional distress damages. At oral argument, the Waters (through counsel) informed us that, in fact, attorney fees were incurred and reminded us that Mrs. Waters had been hospitalized. Unfortunately, there is absolutely no evidence in the record to support a claim that fees were incurred or to suggest that Mrs. Waters incurred any financial obligation for her hospitalization. Although we view the evidence to support the judgment and draw all inferences favorable to the Waters, we cannot infer that fees were incurred or paid when no proof of a fee agreement of any sort was presented to the jury or to the trial court.[15] Similarly, we cannot infer that medical or hospital bills were incurred when there is no reference to any such bills and when it appears distinctly probable that Mrs. Waters' medical bills were all covered by Medicare and group health insurance.

 ▬ ██ ██ In sum, case law simply does not permit recovery of emotional distress damages where, as here, there is no evidence of financial loss. We therefore reverse the judgment and remand the matter to the trial court with directions to enter judgment for USAA.[16]

---

[15]In a postargument letter sent to us by the Waters' attorney, a reference is made to a redacted copy of a contingent fee agreement buried in the Clerk's Transcript. But that agreement was not presented (or even mentioned) at trial, not to the court or to the jury. It was filed in response to a discovery motion and is in the record only because it happens to be an exhibit to another document which was not presented or mentioned at trial. No fees were claimed as costs. At argument, counsel suggested that his clients did not want to appear "over-reaching" by asking for reimbursement for their attorney fees and medical bills. Leaving to one side the inconsistency between this statement and their willingness to ask for and accept $1,375,000 for their emotional distress, this doesn't explain why counsel did not ask the court to bifurcate the issue of special damages or even submit a claim for attorney fees. Even if no portion of the fees was recoverable under *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], proof of fees and costs would have at least provided some evidence of economic harm.

[16]As noted at the outset, resolution of this issue against the Waters makes it unnecessary to consider USAA's other claims of error. It also moots the Waters' cross-appeal which is

### DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter judgment for USAA. The Waters' cross-appeal is dismissed. The parties are to pay their own costs of appeal.

Ortega, Acting P. J., and Fukuto, J.,* concurred.

A petition for a rehearing was denied February 2, 1996, and the petition of plaintiffs and appellants for review by the Supreme Court was denied April 11, 1996. Lucas, C. J., did not participate therein.

---

limited to the issue of punitive damages. As with emotional distress damages, punitive damages cannot be recovered in a bad faith case without proof of financial loss. (*Continental Ins. Co.* v. *Superior Court, supra,* 37 Cal.App.4th at p. 86.)

*Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.