[No. G024720. Fourth Dist., Div. Three. July 31, 2000.]

BRAM NAGER, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Glickman & Glickman and Steven C. Glickman for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Peter H. Klee and Ronald D. Getchey for Defendant and Respondent.

**OPINION**

**CROSBY, J.**—The trial court properly granted an issurer's summary judgment motion in an insured's bad faith claim arising out of $2,000 in disputed no-fault medical payment benefits to a chiropractor lien claimant. The insurer promptly paid what appeared to be the chiropractor's reasonable and necessary bills, and the remainder of the lien was satisfied from the proceeds of the insured's settlement with the drunk driver.

I

Plaintiff Bram Nager was the named insured under an automobile policy with defendant Allstate Insurance Company for his 1984 500 SEC Mercedes Benz. In addition to third party liability coverage, the policy provided no-fault medical payments (med-pay) coverage for up to $10,000 for expenses "actually incurred" by an insured for "necessary" medical treatment

for bodily injury arising out of an automobile accident.[1] The drunk driver was insured by Farmers Insurance Company (Farmers). Nager sued the driver and an adjacent property owner for damages arising out of the accident.

While Nager did not seek medical treatment at the accident scene, he went to Michael Weinstein, an orthopedist, three days later, complaining of stiffness and pain in his neck, stabbing pains in his low back and numbness in his right leg. Weinstein suggested physical therapy and chiropractic treatment. Nager was first seen by a chiropractor, John Vostmyer, in late October 1994.

Vostmyer frequently testified as an expert in personal injury matters, having done so in over 100 cases. Nager signed a contractual lien against the proceeds of any settlement, judgment or verdict he might obtain. In November 1994, Vostmyer prepared an initial evaluation report for Nager's trial counsel.

Allstate initially paid some $470 to Vostmyer for his services. In January 1995, he billed Allstate an additional $705. Allstate cut this charge by $400 because the treatments "exceed[ed] frequency guidelines from the initial date of service" and because "physical therapy exceed[ed] expected duration for the diagnosis indicated."

In April 1995, Allstate paid $500 of a new bill for $775, declining to pay for the attorney report. Vostmyer sent Allstate new statements for an additional $1,400 for treatments from January through May 1995, which the carrier did not pay. The combined contested balance totaled approximately $2,000.

Nager sued Allstate for bad faith in September 1995. His expert, Frank Orma, an insurance claims consultant, opined that Allstate's claims handling practices were unreasonable because it relied upon standardized expectations of the duration of treatment, based on a diagnosis code. He criticized Allstate for not obtaining "an independent medical (or in this case, chiropractic) review of the bills and records."

In February 1996, Vostmyer was paid in full from the proceeds of Nager's settlement with Farmers, acting on the other motorist's behalf. Farmers paid a total of $21,000 to settle Nager's personal injury claim and had earlier entered into a settlement of $20,000 for the property damage claim.

---

[1] The med-pay coverage is provided in coverage "CC" of the Allstate automobile policy. The insuring agreement provides, in pertinent part: "**Allstate** will pay to or on behalf of an insured person all reasonable expenses actually incurred by an insured person for necessary medical treatment . . . actually provided to the insured person."

## II

We consider the totality of the circumstances involving Allstate's handling of Nager's med-pay claim. ■ Not every first party insurance claim is transmogrified into a bad faith suit simply because an insurer questions the amount of a bill before paying it. To give rise to tort liability for bad faith, the insurer's conduct not only must be erroneous but "unreasonable" or "without proper cause" as well (*Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 513-514 [46 Cal.Rptr.2d 845] [affirming summary judgment for insurer which raised legitimate third party coverage dispute]; *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352] [reversing bad faith verdict of over $1.7 million in compensatory and punitive against homeowner's insurer which declined to pay property damage claim based on "genuine" policy dispute].)

The reasonableness of an insurer's claims handling conduct in a first party coverage case becomes a question of law, properly determined on summary judgment, where the evidence is undisputed and but one inference can be drawn. (*Lee v. Crusader Ins. Co.* (1996) 49 Cal.App.4th 1750 [57 Cal.Rptr.2d 550] [summary judgment affirmed]; *Carlton v. St. Paul Mercury Ins. Co.* (1994) 30 Cal.App.4th 1450, 1459 [36 Cal.Rptr.2d 229] [same]; *Globe Indemnity Co. v. Superior Court* (1992) 6 Cal.App.4th 725 [8 Cal.Rptr.2d 251] [writ issued to compel summary judgment].)

In *Lee v. Crusader Ins. Co., supra,* 49 Cal.App.4th 1750, the court affirmed a summary judgment for an insurer in a first party bad faith claim arising out of an arson fire that destroyed the insured's liquor store during the Los Angeles riots. Although the insurer strongly doubted the validity of the arson charges, it conducted no independent investigation, choosing to wait until the insureds were acquitted in a criminal prosecution. *Lee* held the insurer had a "reasonable basis for deferring action on the [insureds'] claim." (*Id.* at p. 1759.)

In like fashion, in *Carlton v. St. Paul Mercury Ins. Co., supra,* 30 Cal.App.4th 1450, the court affirmed an automobile insurer's summary judgment in a bad faith case alleging unreasonable delays in the payment of the insured's collision claim for damages to an antique car. The court noted that the insurer promptly paid the initial cost estimates for repairing the car, and then reopened its file once the insured reported that the costs would be greater than anticipated. While agreeing that the insurer might have handled the claim more "expeditiously in the period after . . . [the insurer] indicated it would reinspect the car," *Carlton* held the delay was not so unreasonable as to give rise to bad faith liability, particularly since the insured himself delayed in submitting the requested paperwork. (*Id.* at p. 1459.)

In *Globe Indemnity Co. v. Superior Court, supra,* 6 Cal.App.4th 725, the court directed that summary judgment be granted to an automobile insurer which delayed paying any first party benefits until the insured submitted to an examination under oath and agreed to a medical examination. (The insured had been injured while riding as a passenger on a stolen motorcycle.) According to the court, "There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insureds." (*Id.* at pp. 730-731.)

Finally, in *Waters v. United Services Auto. Assn.* (1996) 41 Cal.App.4th 1063 [48 Cal.Rptr.2d 910], the court reversed a judgment of $1.3 million in emotional distress damages for insureds who became embroiled in a protracted dispute with their homeowner's insurer regarding rebuilding costs for their fire-damaged home. The insureds never put on any evidence that they "spent a penny of their own" as a result of the insurer's delayed payments. (*Id.* at p. 1069.) *Waters* declined to adopt a rule that a first party insurer " 'which refuses to pay benefits claimed to be due under the policy did so at its own risk. Clearly, both logic and good policy dictate that no such rule ever be applied in first party cases.' " (*Id.* at p. 1081.)

The principles articulated in *Lee, Carlton, Globe Indemnity,* and *Waters* apply with equal force here. We look to the nature of the coverage provided, the reasonably justified expectations of the parties, and the particular conduct in question to determine whether there is a triable issue of material disputed fact that Allstate consciously and deliberately failed to discharge its contractual responsibilities. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395 [272 Cal.Rptr. 387].) But courts are not at liberty to imply covenants " 'directly at odds with a contract's express grant of discretionary power. . . .' " (*New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 504-505 [80 Cal.Rptr.2d 286]; see also *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710] [" 'if defendants were given the right to do what they did by the express provisions of the contract there can be no breach' "].)

## III

Automobile med-pay insurance provides first party coverage on a no-fault basis for relatively low policy limits (generally ranging from $5,000 to $10,000) at relatively low premiums. (*Jones v. California Casualty Indem. Exch.* (1970) 13 Cal.App.3d Supp. 1, 3 [91 Cal.Rptr. 726] ["There is no fault or liability connected with this provision"]; see Croskey et al., Cal. Practice

Guide: Insurance Litigation (The Rutter Group 1999) ¶ 6:708, p. 6E-2 [". . . coverage does not depend on the insured's liability . . . benefits are payable *regardless* of whether the insured was at fault"].) The coverage is primarily designed to provide an additional source of funds for medical expenses for injured automobile occupants without all the burdens of a fault-based payment system. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 6:1221, p. 6G-4.) There is no statutory obligation for med-pay benefits.

 Allstate's med-pay coverage followed these general parameters, although (as Nager himself pointed out) there were notable differences in its policy language from other carriers' forms. Allstate's policy extended coverage only for medical expenses that were "*actually* incurred" by an insured. (Italics added.) It imposed a further requirement that such medical expenses be both "reasonable" and "necessary." "Unreasonable" med-pay expenses were defined as fees "which are substantially higher than the usual and customary charges for those services." "Unnecessary" med-pay expenses were defined as an "excessive number, amount or duration" of medical services.

Equally important, Allstate expressly reserved the right to contest med-pay expenses pending documentation regarding their reasonableness and necessity. The med-pay coverage provided as follows: "If the insured person incurs medical expenses which **we** deem to be unreasonable or unnecessary, **we** may refuse to pay those expenses and contest them. . . . If the insured person is sued by a medical services provider because **we** refuse to pay contested medical expenses, **we** will pay all defense costs and any resulting judgment against the insured person." These policy provisions made it clear that med-pay coverage was not the same as health insurance policies in terms of providing medical benefits to the general public.[2]

Given this policy structure, there are compelling public policy reasons why insurers should not provide medical lien holders with a blank check for

---

[2]By comparison, health insurance policies provide less flexibility to the insurer to question a treating physician's determination that treatment was "medically necessary." Ultimately, the question whether treatment was "medically necessary" for purposes of health care coverage may be determined by the trier of fact. (*Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 10 [233 Cal.Rptr. 76, 729 P.2d 267] "[T]he subscriber's expectations can be best fulfilled not by giving his physician an unreviewable power to determine coverage, but by construing the policy language liberally, so that uncertainties about the reasonableness of treatment will be resolved in favor of coverage"].) In a health insurance context, the validity of provisions making insurers the "sole judge" of medical necessity is "unclear" at best. (See discussion in Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 6:729, pp. 6E-6.11 to 6E-6.12.)

automatic payment of all outstanding bills. Personal injury litigation places a central focus upon medical specials, litigation-oriented medical reports, and depositions and testimony by treating physicians and medical experts. Simple economics preclude such costs from being incurred on a pay-as-you-go basis; rather attorneys, litigants and medical providers rely upon such devices as liens against anticipated judgments or settlements to secure payment, and medical liens are frequently reduced during the process. As the court stated in *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 57 [73 Cal.Rptr.2d 496], "some medical providers with liens may overtreat patients to run up medical special costs, thereby increasing their chances of getting paid. In such instances there are compelling public policy reasons why trial courts should have the discretion to order reduction of private medical liens in the exercise of their equitable powers."

Here, Allstate did not stonewall Nager's med-pay claim or take the position that soft tissue injuries or chiropractic treatments were not covered. To the contrary, Allstate promptly paid Vostmyer's first bill and only questioned subsequent billings when the treatment charges appeared to exceed both his original treatment plan and the amount it determined was customary and reasonable for Nager's diagnosis. Allstate indicated its willingness to continue its investigation and reevaluate the payments upon further information from the medical providers. (See, e.g., *Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 35 [148 Cal.Rptr. 653] ["We also note the openness with which the Company apparently viewed plaintiff's claim as demonstrated by their efforts to seek more information from several sources and *reconsider* plaintiff's claim at various times"].)

Nothing in the record shows that Nager sustained a tangible economic loss sufficient to support a bad faith claim. (*Appleman v. National-Ben Franklin Ins. Co.* (1978) 84 Cal.App.3d 1012, 1014 [149 Cal.Rptr. 117] [med-pay coverage does not extend to expenses covered by Medicare because patient had no financial liability].) He recovered his medical expenses from the drunk driver in the pretrial settlement, and the evidence shows they were used to satisfy Vostmyer's lien. He did not attack the fact of his settlement with Farmers Insurance Company, or what that settlement encompassed. Neither did he question the undisputed evidence that these settlement proceeds were used to satisfy in full Vostmyer's outstanding medical lien. (See also *Waters v. United Services Auto. Assn., supra,* 41 Cal.App.4th at p. 1081 ["[W]e cannot infer that medical or hospital bills were incurred when there is no reference to any such bills and when it appears distinctly probable that

Mrs. Waters' medical bills were all covered by Medicare and group health insurance"].)[3]

There is nothing tortious in Allstate's preliminary use of computerized billing programs as a yardstick to measure the reasonableness of chiropractic bills provided to a litigant by medical lien claimants. Allstate explains that its "knowledge of the reasonable and customary services resides in its computer application for analyzing medical provider bills, which is based on diagnostic codes and standardized treatments established by the American Medical Association and surgeons' colleges. . . . [I]n the case of a serious injury an insured is likely to obtain substantially more medical services for a tightly managed $10,000 than if Allstate acted like an old-style indemnity-type health insurer and paid the provider's rate for whatever the doctor ordered." It would be unrealistic to require insurers to hire outside medical experts to manually review any medical bills before red-flagging them for further analysis or explanation. ■■ ■■ In such circumstances, the costs of review could far exceed any potential savings.[4]

■■ We stress that such computerized billing analyses cannot be used as a subterfuge to chisel med-pay benefits or to engage in a game of chicken with insureds by holding out on paying undisputed med-pay benefits in the hope that another source of payment will be found. (*Waller v. Truck Ins. Exch.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619] [" 'oppressive conduct by claims adjusters seeking to reduce the amounts legitimately

---

[3]Because Nager only sued Allstate for bad faith, we need not decide whether he could have successfully sued in contract for benefits due under the policy. Unlike other carriers' med-pay coverages, the Allstate policy did not contain a reimbursement clause barring double recoveries for an insured's medical expenses. (Cf. *Zubia v. Farmers Ins. Exchange* (1993) 14 Cal.App.4th 790, 799-800 [18 Cal.Rptr.2d 65] ["we find the reimbursement provision of the Policy to be both conspicuous and unambiguous insofar as it relates to medical expense payments . . . ."]; *West v. State Farm Mut. Auto. Ins. Co.* (1973) 30 Cal.App.3d 562, 565 [106 Cal.Rptr. 486] ["there is no legal prohibition against an insurer requiring its insured to provide it with a lien to the extent of benefits paid under the policy against any recovery by the insured from a third party"].) Suffice it to say, Nager cannot predicate a bad faith claim upon his failure to obtain duplicate benefits for his medical expenses under the factual circumstances presented by this case.

[4]Our analysis is not altered by the conclusory declaration of Nager's insurance claims consultant Frank Orma that it was an "absolute breach" of the duties of a claims adjuster to rely upon computer-generated duration-of-treatment reports. The fact that another insurance adjuster might have handled the claim differently does not of itself establish bad faith. (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 865 [84 Cal.Rptr.2d 157] ["Courts must be cautious where an expert offers legal conclusions as to ultimate facts in the guise of an expert opinion"].)

In this regard, the Allstate manual for its "Medical Management" program provided that the information from its computer database "will be used to *guide* our investigations and *assist* our decisions and negotiations on a case-by-case basis. *It will not replace the independent judgement [sic] and decision making of our claim representatives.* Final decisions regarding how to resolve the questions raised will remain the claim rep's responsibility."

payable . . . may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses' "].) Neither can med-pay insurers leave their insureds exposed to the prospects of delayed or deferred medical treatment because of deceptive practices designed to avoid claims payments. (*Neal v. Farmers Ins. Exch.* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980] [insurer attempted to coerce insured into settling uninsured motorist claim].)

But, as we have indicated, no such evidence of bad faith was proffered here. Allstate legitimately asked Vostmyer to substantiate the medical necessity for his treatments and the reasonableness of their costs. Nager was not denied any treatment, and Vostmyer was paid.

Judgment affirmed. Allstate is entitled to costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

On August 23, 2000, the opinion was modified to read as printed above.