Filed 8/24/16  Martinez v. Mercury Ins. Co. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUAN MARTINEZ, | B261003 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC511701) |
| MERCURY INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph R. Kalin, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part.

Sheppard, Mullin, Richter & Hampton, Peter H. Klee and Karin Dougan Vogel for Defendant and Appellant.

Steven B. Stevens, Steven B. Stevens; Sharifi Firm, Scott M. Good; Law Offices of Gregory B. Byberg and Gregory B. Byberg for Plaintiff and Respondent.

———————————

In this insurance bad faith action arising out of an insurance claim on medical expenses caused by an automobile accident, Mercury Insurance Company (Mercury) appeals from a jury verdict and judgment in favor of its insured Juan Martinez (Martinez). Mercury challenges the sufficiency of the evidence to support the jury's emotional distress damages award of $600,000 to Martinez. Agreeing with Mercury that there is insufficient evidence to support the award of damages for emotional distress, we respectfully reverse the emotional distress damages award. Our determination on this issue renders moot Mercury's contention that the award of emotional distress damages is the result of improper jury passion and prejudice.

## BACKGROUND

### I. Martinez's automobile insurance policy

In 2004 or 2005, Martinez obtained an automobile insurance policy issued by Mercury that included "no excess, no reimbursement" medical payment coverage with a policy limit of $5,000. Under this coverage, Mercury had an obligation to provide payment of Martinez's medical bills incurred as a result of injuries sustained in an automobile collision, without regard to fault, up to the $5,000 policy limit. Even if Martinez recovered damages from a third-party responsible for the automobile accident, he had no obligation to provide reimbursement to Mercury of any such payments received from third-party sources. In contrast with this "primary" coverage purchased by Martinez, "secondary" medical payment coverage would require the insured to reimburse the insurer upon any third-party recovery.[1]

### II. Martinez's automobile accident and subsequent injuries

On March 17, 2011, as Martinez drove his 1994 Honda Accord with four passengers (his two children and his girlfriend's two children) near Downey in Los

---

[1] As discussed below, after the March 17, 2011 collision Mercury incorrectly told Martinez that he had secondary medical payment coverage.

Angeles County, a semi-trailer truck driven by a third party collided with the left front and side of Martinez's vehicle.  Either later that evening or the following day, Martinez reported the collision to Mercury and thereafter began experiencing pain in his lower back.

### III.    Martinez's efforts to obtain insurance coverage

Shortly after the accident, the Mercury claims adjuster handling Martinez's file, Cynthia Bouzos (Bouzos), telephoned Martinez and incorrectly told him that he had only liability coverage and therefore he would need to obtain funds from the truck driver's insurer to cover any medical care expenses.  In fact, as discussed above, Martinez had purchased primary medical payment coverage obligating Mercury to provide payment for Martinez's medical expenses up to $5,000.

Desiring medical attention for his pain but not having independent health insurance, Martinez contacted the truck driver's insurance company in an attempt to obtain coverage for medical expenses.  (The record discloses that the insurance policy belonged to the truck driver's employer.  For the sake of convenience, we refer to this insurance company as the truck driver's insurer.)  Unable to obtain resolution with the truck driver's insurer, Martinez contacted Mercury who communicated to him that it also had been unsuccessful in achieving resolution with the truck driver's insurer.

Martinez next retained legal counsel, Jubin Sharifi (Sharifi), in order to assist him in obtaining coverage for medical expenses stemming from the collision.  On March 30, 2011, Sharifi sent Mercury a letter explaining that he represented Martinez and the four children passengers regarding the March 17 collision.

Sharifi gave Martinez a list of healthcare providers who would provide medical services to him on a lien basis.  A medical lien required that a healthcare provider receive payment for its services once a patient receives a settlement from a third-party tortfeasor and that, in exchange, the patient has a contractual obligation to satisfy the medical bills first before disbursing any part of the settlement proceeds.

Martinez began receiving treatment from Mednet, a clinic identified on the list provided by Sharifi:  between approximately April 20 and August 10, 2011, Martinez

3

received therapy about twice a week from a chiropractor, Dr. Tien Bao, an orthopedist, Dr. Edward Stokes, and a physical therapist. Based on a referral from Dr. Stokes or Dr. Bao, Martinez also underwent magnetic resonance imaging (MRI) scans at Advanced Professional Imaging, under the care of radiologist Dr. Sim Hoffman.

On April 11, 2011, Bouzos sent a letter to Sharifi that again misrepresented Martinez's medical payment coverage policy issued by Mercury. The letter incorrectly asserted that Martinez had "excess with reimbursement" coverage requiring Mercury to provide payment of Martinez's medical expenses only if Martinez was unable to obtain payment from a third party and, further, requiring Martinez to reimburse Mercury if he obtained any settlement proceeds from a third-party tortfeasor.

At Sharifi's request, Mercury eventually sent to Sharifi a copy of the certified official declarations page of Martinez's insurance policy showing that Martinez had "no excess, no reimbursement" medical payment coverage.

On or about September 14, 2011 (before the truck driver's insurer had provided any payment to Sharifi or Martinez), Sharifi sent a letter to Mercury notifying the insurance company that Martinez's medical bills totaled $8,512.19 and requesting that Mercury "place these bills in line for payment under the medical payment provision of your insured's automobile policy." Accompanying the letter, Sharifi enclosed copies of the medical bills and medical reports from Mednet and Advanced Professional Imaging.

On September 29, 2011, Mercury assigned Martinez's medical payment claim to its medical review unit to perform a formal review of the medical bills and specifically to determine whether "the injury being diagnosed matche[d] the treatment that was being given" and whether the pricing for the treatment was reasonable. After reviewing Martinez's file, the medical review unit determined that while the treatment matched the diagnosed injury, the treatment should have been priced at $5,532.73 rather than $8,512.19.

In the meantime, in either late September or early October 2011, Sharifi successfully negotiated a settlement with the truck driver's insurer. On or around October 4, 2011, after negotiating a reduction in Martinez's medical bills from $8,512.19

to approximately $4,323, Sharifi paid Mednet and Advanced Professional Imaging out of the settlement proceeds.

On or around October 10, 2011, Bouzos called the truck driver's insurer who confirmed that it had accepted liability for the March 17, 2011 collision and that it had reached a settlement with Martinez and Sharifi.

On or around October 13, 2011, because of suspected fraudulent activity related to the Advanced Professional Imaging radiologist Dr. Hoffman, Bouzos transferred Martinez's file to Mercury's special investigation unit and specifically Mercury special investigator Anna Belk (Belk).

Although Sharifi sent copies of Martinez's medical records to Mercury on November 8, 2011, Belk sent multiple letters to Sharifi insisting that Mercury obtain copies of the medical records directly from the healthcare providers and thus asking that Martinez sign and return certain enclosed medical authorizations for the release of Martinez's medical records.

Subsequently, Belk mailed to the California Department of Insurance and the National Insurance Crime Bureau a form reporting Mercury's pending investigation of suspected fraudulent activity related to Martinez's insurance claim.  Describing the "suspected fraudulent claim activity" as "radiologist recently arrested, investigation ongoing," the form also identified as the "insured" and "other parties to the loss[/]injury" the following persons:  Martinez, his two children, his girlfriend (even though she was not a passenger in the vehicle during the March 17, 2011 collision), and his girlfriend's two children.

After Sharifi sent the signed medical authorizations to Mercury on December 10, 2011, Mercury sent the signed documents to a third-party subcontractor and placed an order with that service to obtain copies of Martinez's medical records directly from the medical providers Mednet and Advanced Professional Imaging.  On or around December 20, 2011 or February 8, 2012, Mercury received by facsimile a copy of Martinez's medical records from Advanced Professional Imaging, which indicated that

5

the medical bill for the MRI service had been paid. On February 9, 2012, Mercury received a copy of Martinez's medical records from Mednet.

In response to Mercury's letter, the California Department of Insurance sent a letter to Mercury stating that the insurer's form contained insufficient information of fraudulent activity to support a criminal investigation.

On May 10, 2012, Belk conducted a recorded interview of Martinez at Sharifi's office. During the interview, Martinez described the March 17, 2011 collision, his subsequent injuries, the treatment he received from Mednet, and the MRI service rendered by Advanced Professional Imaging.

From June 2012 to November 2012, Belk attempted by telephone and by letter to contact Howard Dideban (Dideban), the appointed Mednet representative; however, she was unable to arrange an in-person meeting with him. On November 30, 2012, Belk sent a letter to Dideban advising him that because Mercury had "been unable to obtain the necessary information from [Mednet's] office," Mercury was "unable to resolve the claim or unable to honor the claim at this time."

On December 17, 2012, Belk sent letters to Dr. Stokes and Dr. Bao notifying them that if they failed to contact her within 10 days, Mercury would close Martinez's file.

On December 28, 2012, Mercury "close[d] the claim without payment" for the following reasons: "SIU [special investigation unit] investigation revealed discrepancies in medical billing. Medical providers uncooperative. Appears providers are not interested in pursuing claim."

## IV.     Martinez's lawsuit and Mercury's denial of Martinez's claim

On June 13, 2013, Martinez filed this action alleging, inter alia, breach of contract and breach of the duty of good faith and fair dealing. After the May 6, 2014 deposition of Sharifi in connection with this litigation, Mercury sent a letter (dated May 9, 2014) to Martinez and Sharifi denying Martinez's claim on the basis that it had learned for the first time, during Sharifi's deposition, that Sharifi had paid in full the medical bills using the settlement proceeds and therefore accusing Sharifi and Martinez of fraudulent "concealment."

6

The trial court conducted a jury trial beginning June 9, 2014. Relevant to the issue on appeal concerning the alleged emotional distress suffered by Martinez, during the direct examination of Martinez the following exchange occurred:

"Q: Now, in the last few years you're still raising your family?

"A: Yes.

"Q: You still have Maria Hernandez to take care of?

"A: Yes.

"Q: Could you use—could you have used an extra $5,000—[?]

"A: Yes.

"Q: —from Mercury along that time?

"A: Absolutely.

"Q: Are you a rich guy?

"A: No.

"Q: Do you guys, like a lot of people, tend to struggle from week to week?

"A: Who doesn't.

"Q: Nothing further."

After the trial court granted Mercury's motion for nonsuit on Martinez's claim for punitive damages, the case went to the jury on Martinez's claims for breach of contract and breach of the covenant of good faith and fair dealing.

On June 17, 2014, the jury rendered a general verdict (11 to 1) in Martinez's favor and awarded him $4,323 for "[c]ontractual damages" (medical payment insurance coverage), $56,360 for attorney fees, and $600,000 for "[m]ental suffering/anxiety/emotional distress damages." Mercury's motion for new trial and motion for judgment notwithstanding the verdict argued, inter alia, that "the entirety of plaintiff's evidence of emotional distress was limited to the following testimony" quoted above, that Martinez failed to "present evidence of symptoms of emotional distress or medical treatment relating to those symptoms [and therefore] there was no evidence to support plaintiff's claim for emotional distress damages," and that "the $600,000 award for emotional distress damages was excessive in light of the evidence presented to the

jury . . . [because] [p]laintiff presented no evidence of medical treatment or psychological trauma due to the adjusting of the claim."[2]  The trial court denied both motions on October 10, 2014 and entered judgment on November 3, 2014.  Mercury timely appealed from the judgment and the posttrial orders.

## DISCUSSION

**I.    Case law on emotional distress damages in the insurance bad faith context**

A "covenant of good faith and fair dealing is implicit in every contract." (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43.)  The fundamental purpose of the implied covenant of good faith and fair dealing is that "neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract." (*Ibid.*)  "An insurer is said to act in 'bad faith' when it breaches its duty to deal 'fairly' and 'in good faith' with its insured." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1209.)

In "first party cases" involving an insured's claim against an insurer, the implied covenant of good faith and fair dealing "obligates the insurer to make a thorough investigation of the insured's claim for benefits, and not to unreasonably delay or withhold payment of benefits." (*Major v. Western Home Ins. Co.*, *supra*, 169 Cal.App.4th at pp. 1209–1210.)  If the insurer "without proper cause" refuses to compensate the insured for a loss covered by the policy or unreasonably delays payments

---

[2] Although the brunt of Mercury's argument challenging the emotional distress damages award in its motion for new trial and motion for judgment notwithstanding the verdict concerned whether Martinez had presented sufficient evidence on the threshold requirement of economic loss, we hold that in light of the foregoing statements Mercury sufficiently preserved for appeal the issue of whether Martinez had presented sufficient evidence that he actually suffered emotional distress and therefore Mercury did not forfeit the argument.  Moreover, a party may assert for the first time on appeal that insufficient evidence supports a damages award. (*Roche v. Casissa* (1957) 154 Cal.App.2d 785, 787; *First Nat. Bank v. Maryland Cas. Co.* (1912) 162 Cal. 61, 72–73; *Martin v. Hall* (1971) 20 Cal.App.3d 414, 421.)

due under the policy, its conduct is actionable.  (*Waters v. United Services Auto. Assn.* (1996) 41 Cal.App.4th 1063, 1070.)

Because the covenant of good faith and fair dealing is a contract term, the remedy for such a breach is generally only contract remedies.  (*Cates Construction, Inc. v. Talbot Partners*, *supra*, 21 Cal.4th at p. 43.)  In the insurance policy setting, however, an insured may also recover tort remedies for a breach of the covenant including emotional distress damages resulting from the insurer's bad faith conduct.  (*Id.* at pp. 43–44; *Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 128.)

As a bad faith action seeks remedy for interference with property rights, not personal injury, "damages for emotional distress are compensable as *incidental damages* flowing from the initial breach, not as a separate cause of action."  (*Gourley v. State Farm Mut. Auto. Ins. Co.*, *supra*, 53 Cal.3d at p. 128.)  Thus, unlike the independent tort of intentional infliction of emotional distress, the requirements of outrageous conduct by the insurer and severe emotional distress by the insured are inapplicable.  (*Ibid.*)  "'[D]amages for mental distress have . . . been awarded in cases where the tortious conduct was an interference with property rights without any personal injuries apart from the mental distress.'"  (*Ibid.*)

Nevertheless, a plaintiff must offer competent proof he or she suffered emotional distress; conjecture or speculation cannot be the sole basis for a damages award: "'[E]motional distress is a form of actual damage and must be proved as any other actual damage.'"  (*Austero v. Washington National Ins. Co.* (1982) 132 Cal.App.3d 408, 417 (*Austero*), disapproved on another ground in *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 816–817.)  To be compensable, the emotional injury must be "substantial or enduring," not "trivial or transitory."  (*Tan Jay International, Ltd. v. Canadian Indemnity Company* (1988) 198 Cal.App.3d 695, 708.)  While upholding an award does not require proof of "bankruptcy, physical illness or injury, nor courtroom demonstrations of the destruction of personal peace of mind or well-being," there must be legally sufficient evidence that the plaintiff suffered emotional distress.  (*Ibid.*)  For example, a plaintiff can show "the existence of substantial evidence of emotional distress[] consisting of

anger, anxiety, humiliation and frustration, due to actions of defendant." (*Pistorius v. Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 552.)

## II. Standard of review

We review Mercury's challenge to a jury award under the substantial evidence standard of review. (*Major v. Western Home Ins. Co.*, *supra*, 169 Cal.App.4th at p. 1208.) Under this standard, we review the entire record to determine whether there is substantial evidence, contradicted or uncontradicted, supporting the jury's factual determinations, view the evidence in favor of the prevailing party, and indulge all reasonable inferences to uphold the judgment. (*Fleming v. Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 37–38.) Any substantial evidence in support of the jury's conclusion is sufficient to support an award of damages for emotional distress. (*Id.* at p. 39.)

## III. No substantial evidence to support the emotional distress damages award

The jury awarded Martinez $600,000 for emotional distress caused by Mercury's bad faith conduct. At trial, Martinez testified only that he could "have used an extra $5,000." Mercury contends this evidence is insufficient to support an award of damages for emotional distress. We agree.

In *Austero*, *supra*, 132 Cal.App.3d 408, the plaintiff presented no testimony at trial and, on appeal, argued in support of the jury's emotional distress award that it could be inferred from the evidence of the defendant's bad faith that a person in her shoes would suffer emotional distress. (*Id.* at p. 417.) In striking the award, the court held that "[e]ven assuming such an inference might reasonably be drawn, however, it would not be sufficient to show that [the plaintiff] *actually* suffered emotional distress." (*Ibid.*)

Here, the dearth of evidence showing Martinez's emotional distress is similar to the facts in *Austero*, *supra*, 132 Cal.App.3d 408. Although any substantial evidence in support of the jury's conclusion would have been sufficient to affirm the award, there is a complete absence of evidence that Martinez suffered any emotional distress. On appeal, Martinez argues that he suffered anger, frustration, humiliation, and embarrassment but he fails to cite any specific testimony or documentary evidence presented to the jury at trial. Rather, Martinez argues that based on "common sense" it can be inferred from the

10

evidence of Mercury's tortious conduct that a person in Martinez's shoes would suffer emotional distress. However, such an inference is not sufficient to show that Martinez *actually* suffered emotional distress. (See *id.* at p. 417 ["'emotional distress is a form of actual damage and must be proved as any other actual damage'"]; see also *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1163.) The law is clear that Martinez has the burden to prove his damages with reasonable certainty and that evidence of defendant's bad faith does not lessen this burden. (See *Austero*, at p. 417.) While the jury may empathize with Martinez, the law requires actual evidence that Martinez suffered emotional distress because "none of us are identical or react identically to given situations." (*Commercial Cotton Co. v. United California Bank* (1985) 163 Cal.App.3d 511, 517.)

In contrast to *Austero*, *supra*, 132 Cal.App.3d 408 and the facts of this case, *Fleming v. Safeco Ins. Co.*, *supra*, 160 Cal.App.3d 31 illustrates a sufficient showing to support recovery of emotional distress damages in an action for breach of the implied covenant of good faith. After suffering severe injuries in an automobile accident and presenting an insurance claim to the defendant insurer, the plaintiff insured brought an action for bad faith and malicious and oppressive conduct in the handling of her claim. (*Fleming*, at pp. 35–36.) At trial, the "[p]laintiff testified specifically that she began to get concerned about how [the defendant] was handling her claim . . . . [S]he became more and more nervous and upset worrying about it." (*Id.* at p. 38.) Her testimony "was also confirmed by her father's testimony to the effect that at one point her anxiety became so bad that she had to be hospitalized for hyperventilation." (*Id.* at pp. 38–39.) The appellate court concluded that substantial evidence supported the jury's award of damages for emotional distress. (*Id.* at p. 39.) The contrast with the instant case—wherein neither Martinez nor any other witness provided testimony that Martinez was nervous, upset, or anxious—supports our conclusion that Martinez failed to present sufficient evidence to support a finding of emotional distress.

The evidence in this case is insufficient as a matter of law to sustain any award of emotional distress. Accordingly, the emotional distress damages award cannot stand.

11

Because we find the evidence is insufficient to support the award of damages, we need not consider Mercury's further argument that the $600,000 award of emotional distress damages is the result of improper jury passion or prejudice.  Further, as Mercury cannot show that the identical versions of its proffered documents were "filed or lodged in the case in superior court" as trial exhibits presented to the jury, we deny Mercury's motion to augment the record with them.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

## DISPOSITION

The judgment as to the award of $600,000 in damages for emotional distress is reversed.  In all other respects the judgment is affirmed.  We award costs on appeal to Mercury Insurance Company.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.